1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

8
9
10

KYKO GLOBAL, INC., a Canadian corporation, and KYKO GLOBAL GMBH, a Bahamian corporation,

11

Plaintiffs,

12

v.

13
14
15
16
17
18
19
20
21
22
23
24
25
26

PRITHVI INFORMATION SOLUTIONS, LTD., a Pennsylvania corporation, PRITHVI CATALYTIC, INC., a Delaware corporation, PRITHVI  SOLUTIONS, INC., a Delaware corporation, PRITHVI INFORMATION SOLUTIONS INTERNATIONAL, LLC, a Pennsylvania limited liability company, INALYTIX, INC., a Nevada corporation, INTERNATIONAL BUSINESS SOLUTIONS, INC., a North Carolina, corporation, AVANI INVESTMENTS, INC., a Delaware corporation, ANANYA CAPITAL INC., a Delaware corporation, MADHAVI VUPPALAPATI AND ANANDHAN JAGARAMAN, husband and wife and the marital community composed thereof, GURU PANDYAR AND JANE DOE PANDYAR, husband and wife and the marital community composed thereof, and SRINIVAS SISTA AND JOHN DOE SISTA, husband and wife and the marital community composed thereof, DCGS, INC., a Pennsylvania company, EPP, INC., a Washington corporation, FINANCIAL OXYGEN, INC., a Washington corporation,

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

**PAGE 1 – COMPLAINT**

HUAWEI LATIN AMERICAN SOLUTIONS, INC., a Florida corporation, L3C, INC., a Washington corporation.

Defendants.

Plaintiffs Kyko Global, Inc. and Kyko Global GmbH (hereinafter, collectively "Kyko"), by and through their counsel, Slinde Nelson Stanford, for its Complaint allege as follows:

## I.      INTRODUCTION

1.      This action arises out of the wrongful acts of Defendants relating to Prithvi Information Solutions, Ltd. and its affiliates, officers, directors and certain individuals acting in concert to defraud, deceive and/or misrepresent the existence of certain customer account receivables pledged to Plaintiffs as security for certain advances made to PISL pursuant to an agreement for the factoring of customer account receivables.  Defendants engaged in a conspiracy to create fictitious, counterfeit customers and associated accounts receivable in order to induce Kyko to advance over $17 million in funds, or otherwise to induce Kyko to purchase over tens of millions of dollars of sham receivables.  As a result of such wrongful conduct and by misrepresenting the true nature of the operations, Defendants concealed the fact that the customer accounts receivables did not exist, and, more significantly, hid the fact that Kyko would never be paid back directly from the customers as promised.  By May 28, 2013, Kyko was owed over $17 million from PISL.  Due to Defendants' collective deceptive and wrongful conduct and prior scheme to transfer assets among the multiple Defendants (both in the U.S. and foreign countries) to evade creditors as part of its fraudulent scheme, Plaintiffs also seek a Temporary Restraining Order and Preliminary Injunction enjoining any transfers or sales of assets and freezing the monies held in certain identified bank accounts, and any other financial institutions used to facilitate prior transfers, and any interest any Defendant holds in any monetary accounts receivable,  in order to maintain the status quo.  In addition to seeking

**PAGE 2 – COMPLAINT**

1    injunctive relief and damages under Plaintiffs' common law claims, as set forth herein, Plaintiff

2    seeks remedies and damages under RICO as authorized by the federal statutes at 18 USC §1961

3    *et seq,* including mandatory treble damages.

4        2.    Defendant-Guarantors have executed guarantees with Kyko promising to pay in

5    full any and all obligations owed to Kyko under the factoring agreement entered into by Prithvi

6    Information Solutions, Ltd., and Kyko on November 21, 2011.  Each of the Defendant-

7    Guarantors have failed to honor or otherwise pay the amounts owed to Kyko on demand.

8    Defendants have engaged in a conspiracy to defraud and embezzle funds from Kyko by creating

9    customer account receivables that do not exist and fictitiously corresponding with Kyko by

10   posing as such customers in order to facilitate additional monetary transfers.  Upon discovery of

11   such wrongful conduct, Kyko made demand on the Defendant-Guarantors and such demands

12   have not been met.  More than $17 million is owed to Kyko for fictitious accounts receivable

13   created by Defendants' wrongful acts.

14                    **II.    PARTIES**

15       3.    Plaintiff Kyko Global, Inc. is a Canadian corporation with its principal place of

16   business in Ontario, Canada.  Plaintiff Kyko Global GmbH is a wholly-owned subsidiary of

17   Plaintiff Kyko Global, Inc. with its principal place of business in the Bahamas.  Together, Kyko

18   offers accounts receivable factoring services.

19       4.    Defendant Prithvi Information Solutions, Ltd., ("PISL") is a Pennsylvania

20   corporation and, on information and belief, conducts business in the State of Washington.

21   Defendant Madhavi Vuppalapati ("Madhavi") is one of PISL's directors.

22       5.    Defendant Prithvi Catalytic, Inc. ("Catalytic") is a Delaware corporation and is

23   registered with the Washington Secretary of State to do business in the State of Washington and

24   with its principal place of business in Bellevue, Washington.  Catalytic's sole officer is

25   Defendant Madhavi.

26

**PAGE 3 – COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

6.      Defendant Prithvi Solutions, Inc. ("PSI") is a Delaware corporation and, on information and belief, conducts business in the State of Washington. PSI's president and secretary is Defendant Madhavi, and its treasurer is Defendant Jagaraman.

7.      Defendant Prithvi Information Solutions International, LLC ("PISI") is a Pennsylvania limited liability company registered to do business with the State of Washington Secretary of State and with its principal place of business in Bellevue, Washington. PISI's sole member is Defendant Madhavi.

8.      Defendant Inalytix, Inc. ("Inalytix") is a Nevada corporation and its principal place of business is located in Bellevue, Washington.  Inalytix's president and director is Defendant Madhavi.

9.      Defendant International Business Solutions, Inc. ("IBS") is a North Carolina, corporation and, on information and belief, conducts business in the State of Washington.

10.      Defendant Avani Investments, Inc. ("Avani") is a Delaware corporation, and, on information and belief, conducts business in the State of Washington.  Avani's agent, president and director is Defendant Pandyar or his wife.

11.      Defendant Ananya Capital Inc. ("Ananya") is a Delaware corporation and registered to do business with the Washington Secretary of State and with its principal place of business in Redmond, Washington. Ananya's agent, president and director is Defendant Srinivas Sista ("Sista").

12.      Defendant Madhavi and Anandhan Jagaraman, husband and wife and the marital community composed thereof, are individuals who reside in Bellevue, Washington and conduct business in the State of Washington.  Defendant Madhavi is also a member/director of Defendant PISI; the President/Secretary/Treasurer and Director of Inalytix, Inc.; an officer/director of Catalytic; and a director of and Prithvi Solutions, Inc. and, on information and belief, an officer or director of certain other affiliated entities identified herein as Defendants.  Defendant Anandhan Jagaraman is also the Secretary and Treasurer of Prithvi Solutions, Inc.

**PAGE 4 – COMPLAINT**

**SLINDE NELSON STANFORD**
601 Union Street, Suite 4400
Seattle, WA 98101
p. 206-237-0020; f. 503.417.4250

13.     Defendant Guru Pandyar ("Pandyar") and Jane Doe Pandyar, husband and wife and the marital community composed thereof, are individuals who reside in Bellevue, Washington and conduct business in the State of Washington.  Defendant Pandyar or his wife is also the Director/President of Avani Investments, Inc., an officer of PISL, an officer of Catalytic, and is a full-time employee of various other affiliated companies associated with Defendants PISL and Madhavi.

14.     Defendant Sista and John Doe Sista, husband and wife and the marital community composed thereof, are individuals who reside in Redmond, Washington and conduct business in the State of Washington.  Defendant Sista is also the Director/President of Ananya and an officer of certain other related affiliates and is a full-time employee of various affiliated companies associated with Defendants PISL and Madhavi.

15.     Defendant DSGS, Inc. is a Pennsylvania corporation and, on information and belief, conducts business in the State of Washington.

16.     Defendant EPP, Inc. ("EPP") is a Washington corporation with its principal place of business in Bellevue, Washington.  EPP's registered agent is Defendant Madhavi.

17.     Defendant Financial Oxygen, Inc. ("Financial Oxygen") is a Washington corporation with its principal place of business in Redmond, Washington.  Financial Oxygen's President and Registered Agent is Sista.

18.     Defendant Huawei Latin American Solutions, Inc. is a Florida corporation registered to do business with the Washington Secretary of State and with its principal place of business in Bellevue, Washington.  Huawei Latin American Solutions, Inc.'s President is Defendant Sista.

19.     L3C, Inc. is a Washington corporation and with its principal place of business in Bellevue, Washington.  L3C, Inc.'s Registered Agent is Defendant Pandyar.

/ / / / /

/ / / / /

**PAGE 5 – COMPLAINT**

SLINDE NELSON STANFORD
601 Union Street, Suite 4400
Seattle, WA 98101
p. 206-237-0020; f. 503.417.4250

### III.   JURISDICTION AND VENUE

20.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiff Kyko Global, Inc. is a citizen of Canada.  Plaintiff Kyko Global GmbH is a citizen of the Bahamas.  Plaintiffs are each citizens of a foreign state.  Defendants are each citizens of different states other than India and Bahamas.  None of the plaintiffs are from the same state as any of the defendants and, therefore, there is complete diversity among the parties.  The matter in controversy exceeds the sum or value of $75,000.

21.      The Court also has jurisdiction over this civil action pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1964 for Plaintiffs' Civil RICO claims.

22.     This Court has personal jurisdiction over Defendants.  Defendants have purposefully engaged in substantial business and related communications with Plaintiffs and the claims arise from Defendants' transaction of business within this district.

23.     Venue is proper under 28 U.S.C. §1391 and 18 U.S.C. §1965(a).  A substantial portion of the activities giving rise to Plaintiffs' claims have taken place in this district.  One or more of the Defendants also resides in, maintains its principal place of business in, and/or conducts business activities in this district.

### IV.   FACTUAL BACKGROUND

24.     Kyko entered into an agreement for certain factoring services with PISL on or about November 21, 2011.  PISL and its officers and directors represented to Kyko (in person or by wire, including by telephone and/or email transmission) that it was a growing, vibrant and successful Information Technology ("IT") services company that served many brand-name customers in the United States, such as: Microsoft, Huawei, Dick's Sporting Goods, Enterprise and many others.  PISL represented that it had offices in Pittsburgh, Pennsylvania and Bellevue, Washington.

25.     Pursuant to the agreement between PISL and Kyko, PISL would identify certain of its customer accounts receivable for IT services and would authorize direct payment on those

**PAGE 6 – COMPLAINT**

customer accounts receivable to be made to Kyko in exchange for a portion of the amount

outstanding from its customers to be paid immediately by Kyko.

26.     Before advancing the monies to PISL on designated account receivables, Kyko

would send the invoice to the actual customer (unbeknownst to Plaintiffs to actually be fake

customers created by PISL and/or one or more of the other defendants to intentionally defraud

Plaintiffs for Defendants' monetary gain) and obtain the customer's signed acknowledgment

back (by wire, including by email transmission) that the services were provided and that the

invoice was legitimate and accurate.  Kyko would also verify with the purportedly legitimate

customer that payment should be made to Kyko rather than PISL.  Said verification was received

by wire, including by email transmission.  Once these steps were complete, Kyko would then

advance PISL a portion of the invoiced amount via a bank wire transfer.   When the invoice

became due, PISL's customer would make payment directly to Kyko.  Kyko would then pay the

balance of the invoiced amount to PISL, via a bank wire transfer, less Kyko's interest and certain

fees.  If the purported customer did not ultimately pay Kyko, PISL remained obligated to repay

Kyko for the total amount of the customer account receivable.

### A.     Defendants Executed Multiple Guarantees to Secure their Obligations.

27.     To further secure PISL's obligations to Kyko under the agreement, certain

guarantees were provided by PISL and its affiliates, officers, and directors (by and through one

or more of the other Defendants).  In reality and unbeknownst to Plaintiffs, all of the guarantees

were executed and provided to Plaintiffs as a component of, and in an intentional concerted

effort to perpetuate, Defendants' fraudulent scheme against Plaintiffs as outlined herein.  Neither

PISL, or any of the other defendants who executed guarantees in favor of Plaintiffs, had any

intention of ever honoring any of the guarantees outlined herein.

28.     On November 21, 2011, PISL executed a Guarantee promising that "the

Guarantor, absolutely, irrevocably and unconditionally, guarantees as the primary obligor and

not merely as a surety, to the Trade Financier [Kyko Global, Inc.] the punctual and complete

**PAGE 7 – COMPLAINT**

payment and satisfaction when due (whether at state maturity, by acceleration or otherwise), and at all times thereafter, of each of the Obligations."  A true and correct copy of the Guarantee executed by PISL is attached hereto as <u>Exhibit A</u>.  Said guarantee was executed and sent by PISL to Kyko by wire, including by email transmission.

29.      On or about December 2, 2011, Defendant Madhavi executed a Guarantee promising to irrevocably and unconditionally guarantee certain obligations to Kyko Global, Inc. A true and correct copy of the Guarantee executed by Madhavi is attached hereto as <u>Exhibit B</u>. Said guarantee was executed and then sent by Madhavi to Kyko by wire, including by email transmission.

30.      On or about November 21, 2011, Defendant Catalytic executed a Guarantee promising to irrevocably and unconditionally guarantee certain obligations to Kyko Global, GmbH.  A true and correct copy of the Guarantee executed by Catalytic is attached hereto as <u>Exhibit C</u>. Said guarantee was executed and then sent by Catalytic to Kyko by wire, including by email transmission.

31.      In February 2012, as part of an expansion of the parties' existing relationship with Kyko Global GmbH, further guarantees were entered by Defendants Catalytic, PISL and Madhavi for certain obligations, true and correct copies of which are attached hereto as <u>Exhibits D, E & F</u> respectively.  Said additional guarantees were executed and then sent to Kyko by wire, including by email transmission. In a further effort to cloak their fraudulent scheme with legitimacy and in order to fraudulently obtain money from Plaintiffs, Defendants Catalytic, PISL and Madhavi again promised to irrevocably and unconditionally guarantee certain obligations to Kyko Global, GmbH.  Once again and unbeknownst to Plaintiffs, these guarantees were executed and provided to Plaintiffs as a component of, and in an intentional effort to perpetuate, Defendants' fraud against Plaintiffs as outlined herein. None of the foregoing Defendants had any intention of ever honoring these guarantees.

**PAGE 8 – COMPLAINT**

32.     PISL and its officers (who include one or more of the other Defendants) represented to Kyko that it had substantial relationships with several multi-billion dollar US-based customers. Said communications were made in person and/or by mail or wire, including by email transmission. PISL initially offered accounts receivables for the following five specific major customers ("Five Customers") to Kyko as part of the factoring agreement: (a) Dick's Sporting Goods, a national retailer with over 600 stores, (b) Enterprise Products Partners, a publicly listed U.S. energy asset company, (c) Financial Oxygen, a large U.S. financial services company, (d) Huawei, a global networking and telecommunications company, and (e) L3 Communications, a U.S. publicly listed defense contractor.  Said offerings were made by mail or wire, including by email transmission.  Based on the information provided by PISL, Kyko then sought acknowledgements signed by each of the purported customers verifying that each customer would make payments directly to Kyko.  Said acknowledgments were executed (purportedly by a legitimate customer but in reality by one or more of the Defendants) and then returned to Kyko from PISL by wire, including by email transmission. In reality and unbeknownst to Plaintiffs, the acknowledgments were not signed by legitimate customers, but instead were created and executed by Defendants posing as legitimate customers with purported legitimate accounts receivables.

33.     Kyko also requested from Madhavi, Pandyar and other representatives of PISL that Kyko be put in touch directly with representatives of each of the Five Customers to verify the account receivables were legitimate.  In response, Madhavi and Pandyar specifically represented that this should not be done because it would jeopardize their relationships with these customers. Said representations were made by wire, including by email transmission.  In reality and unbeknownst to Plaintiffs, the true reason why Madhavi and Pandyar did not want Kyko contacting the "Five Customers" was because the customers and/or the alleged accounts receivables were not legitimate, and in order to further conceal and protect Defendants' fraudulent scheme from being discovered.  Madhavi and Pandyar instead offered to obtain and

**PAGE 9 – COMPLAINT**

provide whatever documents that would be required by Kyko to verify the legitimacy of the accounts receivable for these Five Customers.  PISL then presented Kyko with signed acknowledgements from the Five Customers, true and correct copies of which are attached hereto as Exhibit G.   Said acknowledgements were executed and returned to Kyko by wire, including by email transmission.

34.     Once these Five Customers had been verified through the signed acknowledgment process, PISL then purportedly issued invoices to each customer and sent a copy to Kyko for review.  In reality and unbeknownst to Plaintiffs, the invoices were fake and were generated for the intentional purpose of defrauding Plaintiffs out of money for the benefit of Defendants.  Said invoices were sent by one or more of the Defendants, including PISL, to Kyko by wire, including email transmission. Kyko then sought acknowledgment, by email addresses provided to Kyko by PISL for each of the Five Customers, that the purported customer approved each of the PISL invoices.  Unbeknownst to Plaintiffs, but as Kyko would only later discover in March of 2013, the email addresses provided by PISL were counterfeit and were actually surreptitiously controlled and maintained by PISL and not by any of the purported "Five Customers."

35.     For each of the purported Five Customers, Kyko received a response from the purported customer confirming the invoices were approved. Each response came from a designated email address of the purported customer's company.  As stated, the responses Kyko received were not from any real customer, but were instead from PISL (and/or one of the other defendants) posing as a real customer and from a fake email account PISL (and/or one of the other defendants) created, and surreptitiously controlled, to look like a legitimate email account from each of the purported, albeit non-legitimate "Five Customers."  Said confirmations were sent by one or more of the Defendants, including PISL, to Kyko by wire, including by email transmission. As further stated, it was not until March of 2013 when Kyko first discovered that these customer emails were not legitimately associated with each of the Five Customers and, in fact, were counterfeit.

**PAGE 10 – COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

36.      In reliance on PISL's (and/or one or more of the other Defendants') false representations that the invoices were legitimate, Kyko started paying PISL for the submitted receivables, and the purported, albeit fake, customers started paying Kyko directly as the invoices became due.   In reality, it was PISL and/or one of the other defendants who—as part of its ultimate concerted and unified scheme to defraud Kyko—were paying Kyko.  Given the multi-million dollar scheme in play by PISL and the other Defendants, Defendants' scheme had to look real.  Hence, payments were made by PISL (or one or more of the other Defendants) through fake customers, only to end once PISL (and the other Defendants) had left Plaintiffs being owed more than $17,000,000 as a result of Defendants fraudulent scheme with no expectation or plan on Defendants' part that it would be ever be repaid to Plaintiffs.

**B.      PISL's Customers Stop Making Payments on Accounts Receivable to Kyko and PISL Represents That Payments Will Resume Immediately From Customers of PISL's Affiliated Companies Providing IT Services.**

37.      Defendants, disguised as the legitimate customers, made payments on the revolving balance owed for the accounts receivables of the purported Five Customers to Kyko up until February 15, 2013.  After that date, the Five Customers stopped making payments to Kyko. Upon inquiry of why payments had stopped, PISL indicated that a lawsuit by a Japanese company, Sojitz Corporation ("Sojitz"), led to garnishment of bank accounts and that Sojitz had instructed the Five Customers to stop making payments.  In an effort to hide Defendants' fraudulent scheme, Madhavi, Pandyar and other representatives of PISL each assured Kyko that the matter related to Sojitz would be resolved and that PISL intended to resume providing services to the Five Customers in a short time period and payments would again be made within a few weeks' time by the customers.  Said communications were transmitted by wire, including by email transmission.

**PAGE 11 – COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

38.    After payments stopped on February 15, 2013.  Kyko then advised Madhavi, Pandyar and PISL that Kyko intended to contact the legal departments of each of the Five Customers in order to confirm whether or not they were going to pay monies owed to Kyko and to offer that such payments be made into a lawyer's trust account to avoid any concerns such customers might have regarding collection on the judgment entered against PISL by Sojitz. Madhavi, Pandyar and other representatives of PISL pled at length with Kyko that it not contact the Five Customers in order to avoid any damage to their ongoing customer relationship.  Said communications were transmitted by wire, including by email transmission.

**C.    Defendants Attempt To Continue Their Fraudulent Scheme By Issuing Guarantee Checks With Insufficient Funds, Fraudulent Replacement Customers And To Transfer Customer Contracts To Its Affiliated Entities In The U.S. To Avoid Other Creditors.**

39.    At a meeting in March 2013, PISL informed Kyko that it was in the process of transferring customer contracts from PISL to other "affiliated" companies in the U.S. (run by one or more of the other individual defendants) so that Sojitz would not be able to collect on the Five Customer's accounts.  By doing so, Defendants were attempting to make its assets, including accounts receivables, disappear in order to avoid a legitimate creditor from being paid by dissipating depleting, diverting to, and commingling its assets with companies operated and controlled by other Defendants who also make up and operate the fraudulent RICO enterprise as alleged herein.  Kyko refused to participate in discussions of diverting assets from a judgment entered against PISL and, thus, PISL offered to replace the Five Customers with new receivables of other associated and related companies of PISL in the U.S.  Madhavi, Pandyar and other representatives represented to Kyko that the replacement of the Five Customers would then eliminate Kyko's need to contact the Five Customers directly.  This new offer of replacements customers was simply yet another attempt to conceal and continue Defendants fraudulent scheme

**PAGE 12 – COMPLAINT**

against Plaintiffs.  Said communications were transmitted in person and by wire, including by email transmission.

40.     To further secure the amounts owed to Kyko, on or about March 29, 2013, Madhvai, Pandyar, and Sista agreed on behalf of various affiliated PISL companies to enter into a Cross-Guarantee promising to pay on demand the full amounts owed to Kyko.  The Cross-Guarantee was signed by Madhavi, Pandyar (and/or his wife), Sista and their affiliated defendant companies as follows: Catalytic, PSI, PISI, Inalytix, Ananya and Avani.  Each of these Defendants/Cross-Guarantors promised, "on a joint and several basis, to guarantee the obligations of each Debtor to Trade Financier [Kyoto Global GmbH] in respect to the payments of all the Accounts Receivable . . . . by each Debtor."  In reality, the Cross-Guarantees were yet another component of Defendants' fraudulent scheme and an attempt to conceal the scheme and ultimate truth of the scam from Kyko.  A true and correct copy of the Cross-Guarantee dated March 29, 2013 is attached hereto as Exhibit H.  Said Cross-Guarantee was executed and then sent by the identified Defendants to Kyko by wire, including by email transmission.

41.     On April 23, 2013, IBS likewise agreed to separately guarantee the obligations of PISL on the total amounts of certain accounts receivable and amounts outstanding to Kyko by promising to irrevocably and unconditionally guarantee certain obligations to Kyko Global, GmbH.  A true and correct copy of the Guarantee from IBS dated April 23, 2013 is attached hereto as Exhibit I.  Said guarantee was executed and sent to Kyko by wire, including by email transmissions.

42.     Kyko also requested a notarized affidavit from Madhavi confirming the validity of the Five Customers' accounts receivables.  Madhavi agreed and signed the affidavit on April 24, 2013 in Redmond, Washington, certifying under oath that the Five Customer's account receivables were "properly owing to Kyko," that the invoices were not in dispute by the customers, and that the customer contracts had not been terminated.  Said affidavit was sent to Kyko by mail (including Fed Ex) and wire, including by email transmission.

**PAGE 13 – COMPLAINT**

43.     To further secure outstanding payments, on or about March 12, 2013, Madhavi issued ten personal guarantee checks in the amount of $2,000,000 each for a total of $20,000,000.  Madhavi wrote personal checks from her account and authorized in writing that Kyko could present the checks for payment at any bank for the outstanding amounts owed, at Kyko's sole discretion, upon giving 10 days prior written notice to Madhavi by email.  Said personal guarantee checks, or copies of the same, were sent to by Madhavi to Kyko by mail (including Fed Ex) and wire, including by email transmission.

44.     On or about March 12, 2013, Madhavi also issued the following guarantee checks to be issued on behalf of the following Defendants: (a) in the amount of $2,000,000 each for a total of $20,000,0000 from the bank account for Prithvi Information Solutions, LLC (b)  ten checks in the amount of $2,000,000 each for a total of $20,000,0000 on behalf of PISL, (c) ten checks in the amount of $2,000,000 each for a total of $20,000,000 on behalf of Inalytix, (d) ten checks in the amount of $2,000,000 each for a total of $20,000,000 on behalf of Catalytic, and (e)  ten checks in the amount of $2,000,000 each for a total of $20,000,000 on behalf of PSI.  For each entity, Madhavi likewise authorized in writing on behalf of the entity that Kyko could present the checks for payment at any bank for the outstanding amounts owed, at Kyko's sole discretion, upon giving 10 days written notice to Madhavi by email.  Said guarantee checks, or copies of the same, were sent by Madhavi to Kyko by mail (including Fed Ex) and wire, including by email transmission.

45.     PISL, IBS, Catalytic, and Inalytix also offered certain replacement customer account receivables (the "Replacement Customers") from roughly forty customers in the United States.  Madhavi and Pandyar certified by signed affidavits under oath, individually and on behalf of each of these three entities, on or about March 29, 2013, that the accounts receivable were owed for actual services rendered and that there was no dispute with the customer. Madhavi and Pandyar again certified with affidavits signed under oath, individually and on behalf of Inalytix, that an estimated $3.9 million owed on three of the Replacement Customers

**PAGE 14 – COMPLAINT**

SLINDE NELSON STANFORD
601 Union Street, Suite 4400
Seattle, WA 98101
p. 206-237-0020; f. 503.417.4250

accounts receivable were invoices for actual services rendered and that there was no dispute with the customers.  Said offerings and affidavits were provided by the identified Defendants to Plaintiffs by mail (including Fed Ex) and wire, including by email transmission.  Just like the original "Five Customers," Plaintiffs would later discover that some of the Replacement Customers were fake customers formed and controlled by one or more of the Defendants and were simply posing as legitimate customers in an effort to further deceive and defraud Plaintiffs and their good faith efforts to collect the more than $17,000,000 owed to them by PISL (and/or one or more of the other Defendants).

46.     To further deceive Plaintiffs and in an attempt to once again conceal Defendants' fraudulent scheme, Defendants provided Plaintiffs with additional acknowledgements, similar to those the Defendants provided to Plaintiffs for the original "Five Customers."  Just as the acknowledgements for the "Five Customers" were fraudulent, the acknowledgments for the Replacement Customers were fraudulent as well because they came from entities formed and controlled by Defendants posing as real customers that were anything but a legitimate customer. Said additional acknowledgements were provided by Defendants to Plaintiffs by wire, including by email.

47.     On May 22, 2013, Kyko gave notice that it would present the guarantee checks for the total amounts outstanding.

48.     On May 23, 2013, in an email to Kyko, PISL claimed that one of the Replacement Customers, Process Map, Inc. had a large amounts payable and that the contract had been transferred to Prithvi Information Solutions International, LLC and those receivables could be paid to Kyko.  Upon Kyko's contact with Process Map, Inc. by email, Process Map, Inc. informed Kyko that it did not owe "Prithvi" anything and that their "last engagement" with the company "was in 2003."

49.     As of May 28, 2013, the balance owed to Kyko by Defendants, by and through the purported Five Customers was $47,546,739, and the balance owed to PISL (and/or one of the

**PAGE 15 – COMPLAINT**

other Defendants) was $30,469,344, for a net owing to Kyko of $17,077,395, an amount which increases daily as interest continues to accrue.

50.     On June 6, 2013, Kyko deposited six of the guarantee checks in its bank account and the bank has issued a hold on each of these checks because the bank suspects the checks will be returned for insufficient funds.

51.     Each of the Defendant-Guarantors are jointly and severally liable under the guarantees for the total amount of $17,077,395 plus certain fees and interest accruing thereon. Kyko issued a demand for payment to all of the Defendants on June 3, 2013.  None of the Defendants have paid any portion of these amounts due and owing by PISL.

**D.     Kyko Discovers Customer Account Receivables Were Fictitious, Counterfeit Entities Set-Up And Controlled By Defendants In Order To Deceive Kyko Into Advancing Monies.**

52.     While attempting in good faith to collect on the amounts owed in March 2013, Kyko simultaneously instigated its own internal investigation to determine whether the customer account receivables for the Five Customers were legitimate invoices for ongoing services provided by PISL and its affiliates.  Kyko discovered that each of the Five Customers receivables did not exist and that each customer account receivable was intentionally created by Defendants for the express purposes of deceiving Kyko into advancing additional monies as follows:

    a.     Dick's Sporting Goods payments to Kyko had historically come from a bank account for "DCGS, Inc."  Kyko discovered the address for DCGS, Inc. was the same as the Washington address listed on Defendant Madhavi's personal checks provided as guarantee checks in March 2013.

    b.     Enterprise Property Partners payments to Kyko had previously been sent from "EPP, Inc."  A search of corporate records in March 2013 revealed that that the entity EPP, Inc. was a Washington corporation formed by Madhavi in July 2012.

**PAGE 16 – COMPLAINT**

**SLINDE NELSON STANFORD**
601 Union Street, Suite 4400
Seattle, WA 98101
p. 206-237-0020; f. 503.417.4250

c.      Financial Oxygen payments to Kyko had previously been sent from a company called "Financial Oxygen, Inc."  A search of corporate records in March 2013 revealed that Defendant Sista was the President of the company and the company was formed in May 2012 with a principal place of business in Redmond, Washington.

d.      Huawei payments to Kyko had previously been sent from a company called "Huawei Latin American Solutions, Inc."   A search of corporate records in March 2013 revealed that Defendant Sista was the President of that company and the company was formed in January 2012 in the State of Florida.  Kyko discovered that the address of the bank account for "Huawei Latin American Solutions, Inc." was the same as the address submitted for Sista to Kyko in March 2013 in Bellevue, Washington.

e.      L3 Communications payments to Kyko had previously been sent from a bank account for a company called "L3C, Inc."  A search of corporate records in March 2013 revealed that the company "L3C, Inc." was formed in July 2012 and that Pandyar formed the company and was the registered agent.

53.    On or about March 8, 2013, Kyko's counsel contacted the legal department for Dick's Sporting Goods to verify the outstanding amount owed on the invoices to Kyko.  Counsel for Dick's Sporting Goods responded that the PISL had done no work for the company since 2004 and that the persons who had executed the acknowledgment of the PISL invoices and the person who had been PISL's contact for verification of the invoices did not exist.  The persons identified on the acknowledgment and to approve the invoices were not employees of Dick's Sporting Goods.

54.    On or about March 8, 2013, Kyko's counsel contacted the legal department for L-3 Communications to verify the outstanding amount on the invoices owed to Kyko.  L-3

**PAGE 17 – COMPLAINT**

Communication likewise advised that the corporation did not employ the person identified as PISL's contact for invoice verification purposes and that the company's records showed no amounts were owed for services to PISL.

55.     On or about March 19, 2013, Kyko's counsel contacted the legal department of Enterprise Property Partners.  Enterprise Property Partner's counsel advised that the company's records showed no amounts were owed on the invoices identified by Kyko.

56.     For each of the Five Customers and for various Replacement Customers, internet websites were fraudulently created and were in existence displaying authentic company information for the public companies. These addresses for these websites were provided to Plaintiffs by Defendants.  Much of the information was duplicated from the authentic company's websites.  However, upon further investigation in March 2013, Kyko discovered that the domain names for the Five Customers' website were registered in 2011 or 2012 and that the Internet Protocol Addresses, a unique four-part number identifying the precise location of the server, were the same four server locations for almost all of the Five Customers and some of the forty Replacement Customers.  These sham websites not only provided legitimate business information as a façade for the sham customer account receivables, but they also facilitated the creation of sham email addresses and names of contacts at these sham customers for purposes of corresponding with Kyko.  For example, Kyko would write to an individual contact at Huawei requesting conformation of the PISL invoices and the individual contact, who did not actually exist or work at the customer company, would respond back to verify the invoices using the same email specified on the sham websites.  On information and belief, Defendants created, operated, and corresponded with Kyko through these sham websites and email addresses to facilitate a fraud, deceive, and otherwise misrepresent the existence of legitimate customer account receivables.

/ / / / / /

/ / / / / /

**PAGE 18 – COMPLAINT**

SLINDE NELSON STANFORD
601 Union Street, Suite 4400
Seattle, WA 98101
p. 206-237-0020; f. 503.417.4250

## V.   FIRST CAUSE OF ACTION: FRAUD

## (AGAINST ALL DEFENDANTS)

57.   Plaintiffs reallege the allegations in paragraphs 1 through 56 herein.

58.   Defendants, in a concerted and unified effort, made multiple deceptive and misleading false representations of existing facts regarding the existence of certain customers and the validity of those customer's accounts receivables including, without limitation, representations that: (i) certain accounts receivables were legitimate and duly owed to Defendants in exchange for services provided, (ii) that the amounts reflected on certain invoices were properly owed by existing customers, (iii) that there was no dispute between the customers and Defendants regarding the payment on the accounts receivables, (iv) that Defendants had enforceable contracts with certain customers that had not been terminated, and (v) that certain payments would be made directly to Kyko from identified customers on the accounts receivables that did not exist and that were created for the express purpose of deceiving Kyko into advancing additional monies to Defendants.

59.   Defendants' representations were material and false.

60.   Defendants knew at the time the representations were made that their representations were false.

61.   Defendants intended that Kyko would act on the deceptive and misleading representations made.

62.   Plaintiffs were ignorant of the falsity of Defendants' statements at the time the monies were advanced.

63.    Plaintiffs relied on the truth of the representations given by Defendants and had a right to rely on such statements.

64.   As a result of Defendants' fraudulent conduct, Plaintiffs have suffered damages in an amount exceeding $17 million, the exact amount of which will be proven at trial.

**PAGE 19 – COMPLAINT**

1

2

3

4

## VI.   SECOND CAUSE OF ACTION: NEGLIGENT OR INTENTIONAL

## MISREPRESENTATION

## (AGAINST ALL DEFENDANTS)

66.   Plaintiffs reallege the allegations in paragraphs 1 through 65 herein.

67.   Defendants, in a concerted and unified effort, negligently or intentionally supplied information for the guidance of Plaintiffs in their business transactions that were false and/or materially misleading.

68.   Defendants, in a concerted and unified effort, negligently or intentionally omitted information that made their representations regarding customers and accounts receivables false and/or materially misleading.

69.   Defendants knew or should have known that the information was supplied to guide Plaintiffs in their business transactions.  Defendants knew or should have known that the information omitted from their representations regarding customers and accounts receivables was necessary for purposes of Plaintiffs' business.

70.   Defendants were negligent in obtaining or communicating false information.

71.   Plaintiffs relied on the false information supplied by Defendants.

72.   Plaintiffs' reliance on the false information supplied by Defendants was reasonable under the surrounding circumstances.

73.   Defendants' false information was the proximate cause of damages to Plaintiffs in an amount that exceeds $17 million, the exact amount of which will be proven at trial.

## VII.   THIRD CAUSE OF ACTION: CONVERSION

## (AGAINST ALL DEFENDANTS)

74.   Plaintiffs reallege the allegations in paragraphs 1 through 73 herein.

75.   Defendants concerted and unified effort of theft, embezzlement, and misappropriation of monies belonging to Kykos constitutes conversion by Defendants.  The acts

**PAGE 20 – COMPLAINT**

constituting conversion by Defendants have resulted in damages to Plaintiffs in an amount that exceeds $17 million, the exact amount of which will be proven at trial.

### VIII.    FOURTH CAUSE OF ACTION:  BREACH OF THE GUARANTEES
### (AGAINST DEFENDANT-GUARANTORS)

76.    Plaintiffs reallege the allegations in paragraphs 1 through 75 herein.

77.    Defendant-Guarantors, in a concerted and unified effort, executed guarantees with Kyko promising to irrevocably and unconditionally, on a joint and several basis, pay in full any and all obligations owed to Kyko under the factoring agreement entered into by PISL and Kyko on November 21, 2011 up to a $30 million.

78.    Each of the Defendant-Guarantors have failed to honor or otherwise pay the amounts owed to Kyko on demand.

79.    Defendant-Guarantors have breached their obligations to pay under the Guarantees.

80.    As a direct result of the Defendant-Guarantors failure to pay, Plaintiffs have been damaged in an amount that exceeds $17 million, the exact amount of which will be proven at trial.

### IX.    FIFTH CAUSE OF ACTION: TEMPORARY AND PRELIMINARY
### INJUNCTIVE RELIEF
### (AGAINST ALL DEFENDANTS)

81.    Plaintiffs reallege the allegations in paragraphs 1 through 80 herein.

82.    This action arises out of the wrongful and otherwise fraudulent conduct of Defendants to intentionally mislead and/or deceive Plaintiffs and cause Plaintiffs to advance certain additional monies on fictitious, counterfeit customers and associated account receivables. Defendants' wrongful conduct and continued acts of deception demonstrate a calculated scheme to defraud, evade and/or otherwise hide assets from Plaintiffs and Defendants' other existing creditors.

**PAGE 21 – COMPLAINT**

83.    Plaintiffs will suffer immediate irreparable harm if an injunction against Defendants' transfer or sale of assets is not entered.   As Defendants have done previously, Defendants have demonstrated the willful intent to defraud, deceive and/or embezzle funds from its creditors by transferring assets between the affiliated companies (controlled by Defendants) or otherwise assigning customer contracts and receivables to shell entities.  Defendants have repeatedly created and formed new entities with the intent of defrauding and hiding assets from its creditors.   There is an imminent risk of dissipation of assets from which Plaintiffs can recover, and, therefore, an asset freeze is justified.

84.    Defendants should be enjoined from transferring, selling, moving or dissipating assets or otherwise disbursing monies in a manner that would impair Plaintiffs' ability to collect monies legitimately owed by Defendants to Plaintiffs.  The status quo should be preserved intact by ordering an asset freeze on Defendants' identified banking accounts, and any other discovered financial institution and any other assets of Defendants

85.    Equity tips strongly in favor of granting injunctive relief to Kyko. Without an injunction, Plaintiffs will likely lose any customer revenues that provide security on the amounts advanced to Defendants.  Defendants, on the other hand, will not be harmed if an injunction is issued, but rather will continue to receive payments from customers in the ordinary course of business.

86.    The public interest heavily favors granting injunctive relief to Kyko.  An injunction serves the public interest because it is in the public's interest that parties are held accountable for their deceptive and wrongful acts and should not be permitted or given the opportunity to further their fraudulent acts by transferring monies and assets to evade a creditor's lawful enforce of their rights, either outside the jurisdiction or overseas.  It is also in the public interest that any remaining funds are held for the benefit of satisfying debts guaranteed by Defendants.

**PAGE 22 – COMPLAINT**

87.     Temporary and preliminary injunctive relief are necessary and appropriate to protect Kyko from Defendants' wrongful conduct and to preserve funds for Plaintiffs' recovery herein.  Without the relief requested herein, there is an extreme likelihood that Plaintiffs will be unable to recover upon any judgment against Defendants because they will have by then depleted or otherwise dissipated their assets to the extent any judgment obtained by Plaintiffs will be worthless.

## X.     SIXTH CAUSE OF ACTION: CIVIL RICO – 18 U.S.C. § 1961 *ET SEQ.*, WIRE AND MAIL FRAUD

### (AGAINST ALL DEFENDANTS)

88.     Plaintiffs reallege the allegations in paragraphs 1 through 87 herein and assert this claim against all Defendants.

89.     The Defendant corporations, limited liability companies, and individuals are interrelated.  The various Defendants constitute an association-in-fact enterprise, as that term is defined in 18 U.S.C §1961(4).

90.     In order to make additional money, the Defendants developed a scheme and established an enterprise to create fictitious, counterfeit customers and accounts receivable as outlined herein.

91.     18 USC §1964(c) provides a private right of action for mandatory treble damages, costs and attorney's fees to "any person injured in his business or property by reason of a violation of §1962(c) which makes it "unlawful for any person employed by or associated with" a RICO enterprise "to conduct or participate … in the conduct of such enterprises affairs through a pattern of racketeering activity including "mail and wire fraud" §1961(1)(B), mail fraud, 18 USC 1341, and wire fraud, §1343, which prohibits the use of mails (including by private or commercial carrier) and interstate wire transmission for the purpose of implementing a scheme to defraud for the purpose of obtaining money.  All Defendants conspired to, and did, associate and conduct their affairs together as a RICO enterprise to defraud Plaintiff.  Upon information

**PAGE 23 – COMPLAINT**

SLINDE NELSON STANFORD
601 Union Street, Suite 4400
Seattle, WA 98101
p. 206-237-0020; f. 503.417.4250

and belief, every Defendant received a portion of the all the money obtained from Plaintiffs by fraud through the Defendants' RICO enterprise.

92.     Defendants, individually and in conspiracy with one another, are all RICO persons who violated RICO by engaging in (1) "racketeering activity," (2) conducted through a "pattern," (3) affecting an "enterprise," (4) impacting interstate or foreign commerce. Defendants violated 18 USC §1962(c), by conducting and participating in the affairs of an enterprise that is engaged in or affects interstate commerce through a pattern of racketeering activity (mail and wire fraud) as alleged herein.

93.     Defendants also violated 18 USC §1962(d) by conspiring as alleged herein to violate 18 USC §1962(c).

94.     All of Defendants' predicate acts of have the same or similar purpose, participants, victim, or methods of commission, or otherwise are interrelated by distinguishing characteristics as alleged herein.

95.     Defendants' repeated and persistent use of the interstate mail and wire transmission (including telephone, email and internet websites) to commit and perpetuate their fraud, as alleged herein, is related in time and purpose, and is continuing, threatens to continue indefinitely into the future and constitutes a pervasive "pattern" of racketeering activity.  In the alternative to the foregoing "open-ended" continuity, Defendants' fraudulent scheme and related predicate acts as alleged herein have extended over and beyond a two-year period and under the circumstances continued for a "substantial period of time" sufficient to establish a claim under RICO.

96.     Plaintiffs have been damaged in an amount that exceeds $17,000,000 as alleged herein as a direct and proximate result of Defendants' violation of 18 USC §1962.

97.     Plaintiffs are entitled to recover mandatory treble damages, costs and attorney's fees under 18 USC § 1964(c).  This Court should also grant appropriate relief under 18 USC § 1964 and FRCP 65.

**PAGE 24 – COMPLAINT**

## XI.   SEVENTH CAUSE OF ACTION: CIVIL RICO – 18 U.S.C. § 1961 *ET SEQ.*, FINANCIAL INSTITUTION FRAUD
### (AGAINST ALL DEFENDANTS)

98.     Plaintiffs' realleges the allegations in paragraphs 1 through 97 herein.

99.     In addition to Defendants' RICO violations set forth above, Defendants further violated 18 USC §1344 by obtaining money owned by Plaintiff, but under the "custody or control" of one or more financial institutions, each and every time Plaintiff made a payment or advance to Defendants as a direct and proximate result of Defendants' fraudulent scheme as alleged herein.

100.     Plaintiffs have been damaged in an amount that exceeds $17,000,000 as alleged herein as a direct and proximate result of Defendants' violation of 18 USC §1962.

101.     Plaintiffs are entitled to recover mandatory treble damages, costs and attorney's fees under 18 USC § 1964(c).  This Court should also grant appropriate relief under 18 USC § 1964 and FRCP 65.

## XII.   EIGHTH CAUSE OF ACTION – UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

102.     Plaintiffs reallege the allegations in paragraphs 1 through 101 herein and assert this claim against all Defendants.

103.     Defendants obtained funds and profits from Plaintiffs by fraud perpetrated by Defendants and the taking of undue advantage of Plaintiffs in the manner described above. Defendants' conduct gives rise to a cause of action on behalf of Plaintiffs under the equitable remedy of unjust enrichment, which cause of action is hereby stated.  Plaintiffs have been damaged as a proximate result of Defendants' fraudulent scheme and conduct as alleged herein.  Plaintiffs' damages exceed $17,000,000, the exact amount of which will be proven at trial.

**PAGE 25 – COMPLAINT**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

A.     Judgment against the Defendants, jointly and severally, for the total amounts owed to Plaintiffs in an exact amount to be proven at trial;

B.     A temporary and preliminary injunction enjoining Defendants from transferring or otherwise disposing of any assets until Plaintiffs are paid in full or sufficient funds are transferred into an escrow account or the Court's depository;

C.     An award of costs, attorneys' fees, and treble damages pursuant to 18 USC § 1964 *et seq.* and any other basis provided in law or in equity;

D.     Any and all further relief deemed appropriate by the Court.

Dated this 16th day of June, 2013.

SLINDE NELSON STANFORD

By:    /s/ Christina Haring-Larson
       Christina Haring-Larson, WSBA No. 30121
       *Of Attorneys for Plaintiffs*

PAGE 26 – COMPLAINT

## VERIFICATION

I, Kiran Kulkarni, declare as follows:

1.      I am the Chief Executive Officer and founder of Kyko Global, Inc. and Kyko Global GmbH.

2.      I have personal knowledge of Kyko Global, Inc. and Kyko Global GmbH and its activities, including those set out in the foregoing Complaint, and if called upon to testify I would competently testify as to the matters stated herein.

3.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning Kyko Global, Inc. and Kyko Global GmbH and its planned activity are true and correct.

Executed on June ⟶⟶ 16 , 2013.

_____ By: _____
            Kiran Kulkarni
            _____

**PAGE 27 – VERIFICATION**

SLINDE NELSON STANFORD
601 Union Street, Suite 4400
Seattle, WA 98101
p. 206-237-0020; f. 503.417.4250