1

2

3

4

5

6

7

8

9

10

**The Honorable Marsha J. Pechman**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

11

12

13

14

15

16

17

18

KYKO GLOBAL, INC., a Canadian corporation, and KYKO GLOBAL GMBH, a Bahamian corporation,

Plaintiffs,

v.

PRITHVI INFORMATION SOLUTIONS, LTD., an Indian corporation, *et al.*,

Defendants.

Case No. 2:13-CV-1034 MJP

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

19

20

21

22

23

24

    This matter came before the Court for a bench trial from May 31-June 1, 2016.  Plaintiffs Kyko Global Inc. and Kyko Global GmbH (collectively "Kyko") were represented by Darian Stanford and Keith Pitt of Slinde Nelson Stanford.  Defendants were unrepresented and failed to appear at the time of trial.[1]  The Court received various exhibits and heard testimony from Kyko CEO Kiran Kulkarni, from Guru Pandyar, and (via deposition designation) Srinivas Sista.

25

26

    [1] Further, as all named corporate defendants failed to appear or otherwise defend against the claims directed against them, an Order of Default was previously entered by this Court against the corporate defendants on April 4, 2016.  (Dkt. # 365).

PAGE 1 – **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Case No. 2:13-CV-1034 MJP

1   Being fully advised, the Court makes its Findings of Fact and Conclusions of Law:

2                              I.     FINDINGS OF FACT

3   A.     Introduction.

4          1.     This matter traces its roots to the prior action entitled *Kyko Global, Inc. et al v.*

5   *Prithvi Information Solutions, Ltd. et al.*, Case No. 2:13-CV-01034 MJP (the "Prior Lawsuit"),

6   within the United States Court for the Western District of Washington (the "District Court").

7          2.     On June 30, 2013, Kyko and a majority of the defendants named in the Prior

8   Lawsuit entered into a Final Settlement Agreement (the "Settlement Agreement") in an effort to

9   resolve the matters raised therein (the "Settling Defendants").  (Exh. 103.)  The only current

10  Defendants who did not execute the Settlement Agreement were Srinivas Sista and Lalita Sista

11  (collectively the "Sistas") and International Business Solutions, Inc. ("IBS").

12         3.     Guru and Arundathi Pandyar (collectively the "Pandyars") were previously

13  defendants and did not execute the Settlement Agreement.  However, the Pandyars are no longer

14  defendants in this litigation. Kyko subsequently entered into a settlement agreement with the

15  Pandyars, whereby Guru Pandyar would agree to testify truthfully under oath and Kyko agreed

16  to dismiss the Pandyars from the lawsuit.  (Exh. 121.)

17         4.     As of July 31, 2013, the Settling Defendants immediately breached the Settlement

18  Agreement, resulting in series of $18 million (plus costs, attorney fees and interest at 2.45% per

19  month) Confessions of Judgment against these parties.  (Exh. 105-A is the Confession of Prithvi

20  Information Solutions, Ltd.; Exh. 105-B is the Confession of Satish Vuppalapati; Exh. 105-C is

21  the Confession of Prithvi Solutions, Inc.; Exh. 105-D is the Confession of Prithvi Information

22  Solutions International, LLC; Exh. 105-E is the Confession of Prithvi Catalytic; Exh. 105-F is

23  the Confession of Madhavi Vuppalapati; Exh. 105-G is the Confession of L3C, Inc.; Exh. 105-H

24  is the Confession of Inalytix, Inc.; Exh. 105-I is the Confession of Huawei Latin American

25  Solutions; Exh. 105-J is the Confession of Financial Oxygen; Exh. 105-K is the Confession of

26

EPP, Inc.; Exh. 105-L is the Confession of DCGS, Inc.; Exh. 105-M is the Confession of Avani Investments and Exh. 105-N is the Confession of Ananya Capital.)

5.    The Prior Lawsuit was scheduled for trial, on its merits, on July 7, 2014.

6.    Twenty days before trial, on June 17, 2014, the Sistas and the Pandyars filed respective petitions for bankruptcy. (Exhs. 133-134.) The bankruptcy filings were encouraged by Satish Vuppalapati to delay the trial of the Prior Lawsuit. (Exh. 119.) On June 19, 2014, the District Court entered the Order Staying Case [Prior Lawsuit Dkt. # 226] with respect to the Prior Lawsuit "pending resolution of the bankruptcy proceedings."

**B.    Parties and Jurisdiction.**

7.    Plaintiff Kyko Global, Inc. is a Canadian corporation with its principal place of business in Ontario, Canada. Plaintiff Kyko Global GmbH is a wholly-owned subsidiary of Plaintiff Kyko Global, Inc. with its principal place of business in the Bahamas. Together, Kyko offers accounts receivable factoring services. Kiran Kulkarni is the CEO for Kyko.

8.    Defendant Prithvi Information Solutions, Ltd. ("PISL") is an Indian corporation and conducts business in the State of Washington. (Exhs. 128-129.) At all material times, Defendant Madhavi Vuppalapati was one of PISL's directors and its chairperson.

9.    Defendant Prithvi Solutions, Inc. ("PSI") is a Delaware corporation and conducts business in the State of Washington. (Exhs. 128-129.)

10.    Defendant Prithvi Information Solutions International, LLC ("PISI") is a Pennsylvania limited liability company registered to do business with the State of Washington Secretary of State. (Exhs. 128-129.) At all material times, PISI's sole member was Madhavi Vuppalapati.

11.    Defendant Inalytix, Inc. ("Inalytix") is a Nevada corporation and its principal place of business is located in Bellevue, Washington. (Exhs. 128-129.) At all material times, Inalytix's president and director was Madhavi Vuppalapati.

12.     Defendant International Business Solutions, Inc. ("IBS") is a North Carolina, corporation.  (Exh. 129.)

13.     Defendant Avani Investments, Inc. ("Avani") is a Delaware corporation.  (Exh. 129.)

14.     Defendant Ananya Capital Inc. ("Ananya") is a Delaware corporation and registered to do business with the Washington Secretary of State and with its principal place of business in Redmond, Washington.  (Exhs. 31-32 and 129.)  At all material times, Ananya's agent, president and director was Mr. Sista.  (Exhs. 31-32.)

15.     Defendant Madhavi Vuppalapati and Anandhan Jagaraman, husband and wife and the marital community composed thereof, are individuals who at all relevant times resided in Bellevue, Washington.  Madhavi Vuppalapati, at all material times herein, was also a member/director of Defendant PISI; the President/Secretary/Treasurer and Director of Inalytix, Inc.; and a director of and Prithvi Solutions, Inc. and an officer or director of certain other affiliated entities identified herein as Defendants.

16.     Satish Vuppalapati is the brother of Madhavi Vuppalapati.  He actively orchestrated this massive fraud (from 2011 to the present) along with his sister through various companies and sham entities (many of which are either incorporated within this State or expressly authorized to transact business within this State).  Satish Vuppalapati and Madhavi Vuppalapati are collectively referred to as the "Vuppalapatis."

17.     Defendant Srinivas Sista and Lalita Sista, husband and wife, and the marital community composed thereof, are individuals who at all relevant times reside in Redmond, Washington. Mr. Sista is also the Director/President of Ananya and an officer of certain other related affiliates and is a full-time employee of various affiliated companies associated with Defendants PISL and the Vuppalapatis.

18.     Defendant DCGS, Inc. ("DCGS") was created as a sham Pennsylvania corporation by Madhavi Vuppalapati on June 1, 2012.  (Exh. 42.)  The office address for DCGS, Inc. is a condominium in Pittsburgh owned by Madhavi Vuppalapati.  (Exhs. 42 and 127.)

19.     Defendant EPP, Inc. ("EPP") was created as a sham Washington corporation by Madhavi Vuppalapati on July 12, 2012.  (Exh. 48.)  Its "principal location" is a Bellevue address owned by a cousin of Madhavi Vuppalapati, and its registered agent is Madhavi Vuppalapati. (Exhs. 48 and 127.)

20.     Defendant Financial Oxygen, Inc. ("Financial Oxygen") was created as a sham Washington corporation by Srinivas Sista on May 1, 2012.  (Exh. 37.)  Its principal place of business is Mr. Sista's home address in Redmond, and Mr. Sista is Financial Oxygen's President and Registered Agent is Mr. Sista.  (Exhs. 37 and 127.)

21.     Defendant Huawei Latin American Solutions, Inc. ("Huawei") was created as a sham Florida corporation registered to do business with the Washington Secretary of State by Madhavi Vuppalapati on December 22, 2011.  (Exh. 15.)  While the name on the Articles of Incorporation is Mr. Sista's, Mr. Pandyar testified that the Vuppalapatis used Mr. Sista's name initially without his knowledge, but that Mr. Sista ultimately consented.  (Exh. 15.)  The principal place of business is PISL's Bellevue, Washington office.  (Exh. 127.)  Huawei Latin American Solutions, Inc.'s President is Defendant Mr. Sista.

22.     Defendant L3C, Inc. ("L3C") was created as a sham Washington corporation by Guru Pandyar on July 13, 2012.  (Exhs. 49-50.)  Mr. Pandyar created L3C at the instruction of the Vuppalapatis.  L3C's principal place of business is Mr. Pandyar's former home address, and Mr. Pandyar is also the registered agent.  (Exhs. 49-50, 127.)

23.     Jurisdiction to consider this Complaint arises under 28 U.S.C. §§ 1332, 1334, and 157, 11 U.S.C. § 523, and Fed. R. Bankr. P. 7001.  The Court also has jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1964 for the Kyko's civil RICO claims. Plaintiff Kyko Global, Inc. is a citizen of Canada.  Plaintiff Kyko Global GmbH is a citizen of

the Bahamas.  Plaintiffs are each citizens of a foreign state.  Defendants are each citizens of different states other than Canada and Bahamas.  None of the Plaintiffs are from the same state as any of the Defendants and, therefore, there is complete diversity among the parties.  The matter in controversy exceeds the sum or value of $75,000.  This Court has personal jurisdiction over Defendants.  Defendants have engaged in substantial business and related communications with the Plaintiffs and the claims arise from the Defendants' transaction of business within this district and that relate to the Debtors' case under Title 11.  This matter involves a core proceeding under 28 U.S.C. § 157(b)(2)(B), (I), & (J).  Venue is proper in this court under 28 U.S.C. §§ 1391, 1408 & 1409 and 18 U.S.C. § 1965(a).  A substantial portion of the activities giving rise to the Plaintiffs' claims have taken place in this district.

## C. Background to the fraudulent scheme.

24.     In mid-2011, a third party individual reached out to Kyko and Kiran Kulkarni about the possibility of Kyko providing accounts receivable factoring services to PISL.  The specific factoring arrangement is detailed further below.  In short, it involved Kyko effectively purchasing accounts receivable invoices allegedly due to PISL from various third-party customers.  Kyko would pay PISL the amount of the invoice (minus a small fee) directly at the time of the invoice, and then Kyko would collect the actual receivable directly from the customer 45-60 days later.

25.     Around Summer 2011, Satish Vuppalapati met with Kiran Kulkarni in India to discuss the matter further.  At that meeting, and in subsequent communications in person, by phone and by email, the Vuppalapatis represented to Mr. Kulkarni that PISL was a growing, vibrant and successful information technology services company that served many brand-name customers in the United States.  One, Microsoft, was actually a legitimate customer.  However, Microsoft never became a subject of factoring with Kyko and PISL.

26.     Instead, PISL and the Vuppalapatis eventually offered Kyko five other supposed customers with allegedly millions of dollars in receivables:  (a) Huawei, a global networking and

1   telecommunications company;  (b) Financial Oxygen, a large U.S. financial services company;

2   (c) Dick's Sporting Goods ("Dick's"), a national retailer with over 600 stores; (d) Enterprise

3   Products Partners ("EPP"), a publicly listed U.S. energy asset company; and (e) L3

4   Communications ("L3C"), a U.S. publicly listed defense contractor.  (Exh. 57.)  These five

5   customers, all fraudulent, are collectively referred to as the "Fake Five Customers."

6         27.    The Vuppalapatis' representations to Kyko surrounding the Fake Five Customers

7   were material and fraudulent.  The Fake Five Customers were not clients of PISL or any of the

8   Defendants, and thus there were never any receivables due to PISL.  The Vuppalapatis knew that

9   their representations to Kyko were fraudulent, and they made these fraudulent representations to

10   induce Kyko to provide money.

11         28.    Based on the fraudulent representations, Kyko entered into an agreement for

12   certain factoring services with PISL and with Prithvi Catalytic on or about November 21, 2011.

13   (Exhs. 2-3, respectively.)  Defendants also executed numerous other documents, such as

14   guarantees, security agreements and written checks, to perpetuate the fraudulent scheme.  These

15   are discussed further below.

16         29.    Pursuant to the factoring agreement, PISL would identify certain of its customer

17   accounts receivable for IT services and would authorize direct payment on those customer

18   accounts receivable to be made to Kyko in exchange for a portion of the amount outstanding

19   from its customers to be paid immediately by Kyko.  (Exhs. 2-3.)  This arrangement theoretically

20   allowed PISL to be paid immediately on invoices rather than waiting the standard 45-60 days.

21   The identify of the customers involved in the factoring relationship could change or expand over

22   time.

23         30.    With the factoring agreement in place between Kyko and PISL, there were

24   various steps required before money changed hands.

25              a.    Step one was for the customer of PISL or Prithvi Catalytic to execute a

26                   document authorizing or acknowledging that it would pay invoices

PAGE 7 – **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Case No. 2:13-CV-1034 MJP

directly to Kyko rather than to PISL.  Kyko asked to contact each of the Fake Five Customers directly to obtain this information, but the Vuppalapatis refused, claiming such communication would jeopardize their business relationships.  This was a lie—the real reason was that there were no such customers.  All five of the direct payment authorizations were fraudulent.  (Exhs. 10, 19, 35, 36, 45.) Instead, Defendants (the Vuppalapatis and Mr. Pandyar at the direction of the Vuppalapatis) prepared the five authorizations using fraudulent corporate names, fraudulent witness names, fraudulent signatures, and fraudulent physical and email addresses.  (Exhs. 10, 19, 35, 36, 45.)   The Vuppalapatis and Mr. Pandyar at the direction of the Vuppalapatis transmitted these fraudulent materials to Kyko by wire.   The *real* Dick's, EPP, Financial Oxygen, L3C and Huawei never authorized anything because they were not then customers of PISL or any related entity.

b.   Step two was for PISL to send an invoice to Kyko for an alleged account receivable.   (Exs. 52-56, 65-66 contain sample invoices.)  The Vuppalapatis and Mr. Pandyar acting at the direction of the Vuppalapatis prepared myriad fraudulent invoices reflecting fraudulent work on fraudulent dates in order to perpetuate the collective deception.   The fraudulent invoices were sent back and forth by wire transmission.

c.   Step three was for Kyko to send the invoice(s) to the customer to confirm that the customer accepted the invoice as legitimate and representing an amount owed.  (Exhs. 52-56 and 59-62 contain communications from Kyko asking for invoice authorization.)  While Kyko thought it was communicating with persons such as "Beth Greene" at L3C, "Aravind Kumar Reddy" at Dick's, "Alves Oilviera" at Huawei Latin American

PAGE 8 – **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Case No. 2:13-CV-1034 MJP

Solutions, and "Tanu Gupta" at EPP, none of those persons actually existed.  (Exs. 52-56.)  The names were made up by the Vuppalapatis and Mr. Pandyar acting at the direction of the Vuppalapatis to defraud Kyko.  Their email addresses were fraudulent in the sense that email to and from these "persons" actually went to the Vuppalapatis and Mr. Pandyar.  The Vuppalapatis and Mr. Pandyar acting at the direction of the Vuppalapatis intentionally set up the fraudulent email addresses to look as close as possible to the real company email addresses.  (Exhs. 125-126.)

d.  Step four was for the "customer" to confirm the invoice amounts.  In reality, it was the Vuppalapatis, and Mr. Pandyar acting at the direction of the Vuppalapatis, who responded by pretending to be a representative of the Fake Five Customers and "confirming" the fraudulent invoices for work that was never performed for customers who did not exist.  (Exs. 52-56 and 59-62 represent such fraudulent "confirmations.")  These fraudulent communications occurred by email across state and national lines on multiple occasions.

e.  Step five was payment by Kyko to PISL.  Once Kyko received the (fraudulent) customer confirmation, Kyko would pay PISL the invoices minus a small transaction percentage through wire transfer.  These wire transfers happened multiple times over the course of a year and involved millions of dollars crossing state and national lines.  (Exhs. 138 and 138-A.)  All but the final couple of invoices that Kyko paid were wired to PISL's bank in Pennsylvania.  The last couple of invoices were paid to a different PISL bank account in Washington.  (Exs. 138 and 138-A.)

f.  Step six, the final step, was payment by the Fake Five Customers to Kyko sometime within the next 45-60 days.  Because Kyko would expect the

money to come from the customer directly, Defendants obtained Employer Identification Numbers from the Internal Revenue Service and then set up real bank accounts for the Fake Five Customers to receive money from PISL and then wire it back to Kyko.  (Exh. 129.)  The Vuppalapatis and Mr. Pandyar acting at the direction of the Vuppalapatis as well as Mr. Sista orchestrated the establishment of five such bank accounts:  Fifth Third Bank for Dick's (Exhs. 40, 41 and 137-A); JP Morgan Chase for EPP (Exh. 137-B);  US Bank for Huawei Latin American Solutions (Exh. 137-D); Wells Fargo for Financial Oxygen (Exh. 137-C; and Bank of America for L3C (Exh. 137-E).

g.   Over the course of slightly more than a calendar year, from around November 2011 to around February 2013, millions of dollars was wired by Defendants across state and national lines to and from these bank accounts for the Fake Five Companies as a part of the fraudulent scheme of Defendants.

31.   If the purported customer did not ultimately pay Kyko, the Vuppalapatis, PISL and the other corporate Defendants remained obligated to repay Kyko for the total amount of the customer account receivable.  (Exs. 2-9, 11-12, 20-26, 69-71, 76.)

**D.   Defendants further executed various fraudulent documents to "secure" the obligations to Kyko.**

32.   To further secure PISL's obligations to Kyko under the factoring agreement, certain guarantees were provided by PISL and its affiliates, officers, and directors (by and through one or more of the other Defendants).  In reality and unbeknownst to Kyko, all of the guarantees were executed and provided to Kyko as a component of, and in an intentional concerted effort to perpetuate, Defendants' fraudulent scheme.  Neither PISL, nor any of the other Defendants who executed guarantees in favor of Kyko, had any intention of ever honoring

any of the guarantees.  Defendants were at all times aware that the statements they were making in such guarantees were materially false and that Kyko would be relying on such guarantees in order to extend funding.

33.    On November 21, 2011, PISL executed a Guarantee promising that "the Guarantor, absolutely, irrevocably and unconditionally, guarantees as the primary obligor and not merely as a surety, to the Trade Financier [Kyko Global, Inc.] the punctual and complete payment and satisfaction when due (whether at stated maturity, by acceleration or otherwise), and at all times thereafter, of each of the Obligations."  (Exh. 7.)  Said guarantee was executed by Satish Vuppalapati and sent by PISL to Kyko by wire, including by email transmission.

34.    On or about December 2, 2011, the Vuppalapatis each executed separate Guarantees promising to irrevocably and unconditionally guarantee certain obligations to Kyko Global, Inc.  (Exhs. 11-12.)  Said guarantees were executed and then sent by the Vuppalapatis to Kyko by wire, including by email transmission.

35.    On or about November 21, 2011, an entity then named Prithvi Catalytic, Inc. ("Catalytic"), previously a defendant in this action, executed a Guarantee promising to irrevocably and unconditionally guarantee certain obligations to Kyko Global, GmbH.  (Exh. 6.) Said Guarantee was executed by Mr. Pandyar on behalf of Catalytic and then sent to Kyko by wire, including by email transmission.

36.    In February 2012, as part of an expansion of the parties' existing relationship with Kyko Global GmbH, further guarantees were entered by Catalytic, PISL, and the Vuppalapatis for certain obligations.  (Exhs. 22-25.)  Said additional guarantees were executed and then sent to Kyko by wire, including by email transmission.

37.    In March 2013, as part of a further effort to cloak their fraudulent scheme with legitimacy and in order to fraudulently obtain money from Kyko, Catalytic, PISL, and the Vuppalapatis again promised to irrevocably and unconditionally guarantee certain obligations to Kyko Global GmbH.  (Exh. 76.)  Once again and unbeknownst to Kyko, the Vuppalapatis and

PAGE 11 – **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Case No. 2:13-CV-1034 MJP

1   Defendants executed these guarantees as a component of, and in an intentional effort to

2   perpetuate, Defendants' fraud against Kyko. None of the foregoing Defendants had any intention

3   of ever honoring these guarantees.

4         38.     To further guarantee and secure any outstanding amounts to Kyko, PISL and

5   other Defendants (Ananya, PSI, PISI, IBS, Avani, and Inalytix) also executed General Security

6   Agreements for Kyko.  (Exhs. 5, 21, 80-85.)  And, various Defendants and Madhavi Vuppalapati

7   also wrote checks to Kyko to be cashed in the event that the "customer" did not pay the invoice

8   to Kyko as promised.  There were two series of checks each totaling $2m (Exs. 8, 9) and four

9   series of checks each totaling $20m (Exs. 69, 70, 71 and 74) from PSI, from PISL, from Madhavi

10  Vuppalapati and from Inalytix respectively.  Defendants executed these checks from various

11  bank accounts across the United States.  None had sufficient funds to cover the obligations;

12  instead, Defendants executed the checks to perpetuate their fraudulent scheme.

13       **E.**     **PISL's Customers Stop Making Payments on Accounts Receivable to Kyko.**
14             **PISL Represents That Payments Will Resume Immediately From Customers**
           **of PISL's Affiliated Companies Providing IT Services.**

15        39.     From around November 2011 until around February 2013, Defendants used

16  Kyko's money to pay Kyko.  In other words, after Kyko wired money to PISL's bank account in

17  Pennsylvania and then Washington (Exhs. 138 and 138-A), the Vuppalapatis, and Mr. Pandyar at

18  the direction of the Vuppalapatis, moved that money by wire transmission to each of the various

19  bank accounts for the Fake Five Customers and then "paid" Kyko the appropriate amount from

20  those accounts.  (Exhs. 137-A through 137-E.)

21        40.     Problems began around November 2012, when Huawei Latin American Solutions

22  (a name chosen by Defendants to be close to the real Huawei company) did not make a payment

23  on time.  In response to an inquiry from Kyko, Madhavi Vuppalapati, using the fraudulent name

24  "Alves Oilviera" and the fraudulent email address of "alves.oilviera@huawei.com.ag,"

25  responded by email to Kyko that there was a software problem at Huawei and that everything

26  would be resolved shortly.  This information was of course false.  A couple of months later,

another fraudulent invoice confirmation exchange between Kyko and "Alves" at "Huawei Latin American Solutions" appeared to confirm that things were getting back on track.  (Exhs. 59-60.)

41.     Then, around February 15, 2013, the Fake Five Customers stopped making payments to Kyko.  At this time, Kyko had approximately $17 million (not including interest) in outstanding invoice payments that it was waiting to be repaid.  (Exh. 139.)

42.     Upon inquiry of why payments had stopped, PISL indicated that a lawsuit by a Japanese company, Sojitz Corporation ("Sojitz"), led to garnishment of bank accounts of PISL and that Sojitz had instructed the Fake Five Customers to stop making payments.  In an effort to hide Defendants' fraudulent scheme, the Vuppalapatis, Mr. Pandyar, and other representatives of PISL each assured Kyko that the matter related to Sojitz would be resolved and that PISL intended to resume providing services to the Fake Five Customers in a short time period and payments would again be made within a few weeks' time by the customers.  Said communications were transmitted by wire, including by email transmission.

43.     Kyko then advised the Vuppalapatis, Mr. Pandyar and PISL that Kyko intended to contact the legal departments of each of the Fake Five Customers in order to confirm whether or not they were going to pay monies owed to Kyko and to offer that such payments be made into a lawyer's trust account to avoid any concerns such customers might have regarding collection on the judgment entered against PISL by Sojitz.  The Vuppalapatis and other representatives of PISL pled with Kyko not to contact the Fake Five Customers in order to avoid any damage to their ongoing customer relationship.  Said communications were transmitted by wire, including by email transmission.

**F.     Defendants Attempt To Continue Their Fraudulent Scheme By Issuing Guarantee Checks With Insufficient Funds, Fraudulent Replacement Customers, And To Transfer Customer Contracts To Its Affiliated Entities In The U.S. To Avoid Other Creditors.**

44.     At a meeting in March 2013, PISL informed Kyko that it was in the process of transferring customer contracts from PISL to other "affiliated" companies in the U.S. (run by one

PAGE 13 – **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Case No. 2:13-CV-1034 MJP

1  or more of the other individual defendants) so that Sojitz would not be able to collect on the Five

2  Customers' accounts.  By doing so, Defendants were attempting to make their assets, including

3  accounts receivables, disappear in order to avoid a legitimate creditor from being paid by

4  dissipating, depleting, diverting to, and commingling its assets with companies operated and

5  controlled by other Defendants who also make up and operate the fraudulent RICO enterprise as

6  described herein.

7         45.    Kyko refused to participate in discussions of diverting assets from a judgment

8  entered against PISL and, thus, PISL offered to replace the Fake Five Customers with new

9  receivables of other associated and related companies of PISL in the U.S.  The Vuppalapatis

10  represented to Kyko that the replacement of the Fake Five Customers would then eliminate

11  Kyko's need to contact the Fake Five Customers directly.  Said communications were

12  transmitted in person and by wire, including by email transmission.

13         46.    To further secure the amounts owed to Kyko, on or about March 29, 2013, the

14  Vuppalapatis, and Mr. Sista agreed on behalf of various affiliated PISL companies to enter into a

15  Cross-Guarantee promising to pay on demand the full amounts owed to Kyko.  (Exh. 76.)  The

16  Cross-Guarantee was signed by the Vuppalapatis, Mr. Sista and their affiliated defendant

17  companies as follows: Catalytic, PSI, PISI, Inalytix, Ananya, and Avani.  Each of these

18  Defendants/Cross-Guarantors promised "on a joint and several basis, to guarantee the obligations

19  of each Debtor to Trade Financier [Kyko Global GmbH] in respect to the payments of all the

20  Accounts Receivable... by each Debtor."  In reality, the Cross-Guarantees were yet another

21  component of Defendants' fraudulent scheme and an attempt to conceal the scheme and ultimate

22  truth of the scam from Kyko.  The Cross-Guarantee was sent to Kyko by wire, including by

23  email transmission.

24         47.    However, unbeknownst to Defendants, Kyko reached out directly to at least one

25  of the Fake Five Customers, Dick's.  On March 29, 2013, Kyko received an email response from

26  Mary Tortorice, Vice President and Senior Corporate Counsel for the real Dick's Sporting

PAGE 14 – **FINDINGS OF FACT AND CONCLUSIONS
OF LAW**

Case No. 2:13-CV-1034 MJP

Goods, that the real Dick's Sporting Goods had no relationship with any Prithvi entity, that there was no "Aravind Kumar Reddy" at the real Dick's, that email addresses at the real Dick's end in "dcsg.com" rather than "dcsginc.com", and that the real Dick's did not owe Prithvi (or Kyko) any money.  (Exh. 72.)

48.     On April 23, 2013, IBS likewise agreed to separately guarantee the obligations of PISL on the total amounts of certain accounts receivable and amounts outstanding to Kyko by promising to irrevocably and unconditionally guarantee certain obligations to Kyko Global, GmbH.  (Exh. 91.)  This guarantee was executed and sent to Kyko by wire, including by email transmissions.  Satish Vuppalapati orchestrated and directed that IBS execute and send this Guarantee to Kyko.  In reality, IBS was defunct and without any assets whatsoever.

49.     Kyko also requested a notarized affidavit from the Vuppalapatis confirming the validity of the Fake Five Customers' accounts receivable.  Madhavi Vuppalapati signed her affidavit on April 24, 2013 in Redmond, Washington, certifying under oath that the Fake Five Customers' accounts receivable were "properly owing to Kyko," that the invoices were not in dispute by the customers, and that the customer contracts had not been terminated.  (Exh. 93.) Satish Vuppalapati signed an identical affidavit in India.  (Exh. 94.)  Said affidavits were sent to Kyko by mail (including Fed-Ex) and wire, including by email transmission.

50.     To further secure outstanding payments, on or about March 12, 2013, Madhavi Vuppalapati issued ten personal guarantee checks in the amount of $2,000,000 each for a total of $20,000,000.  (Exh. 71.)  Madhavi Vuppalapati wrote personal checks from her account and authorized in writing that Kyko could present the checks for payment at any bank for the outstanding amounts owed, at Kyko's sole discretion, upon giving 10 days' prior written notice to Madhavi Vuppalapati by email.  Said personal guarantee checks, or copies of the same, were sent to by Madhavi Vuppalapati to Kyko by mail (including Fed Ex) and wire, including by email transmission.

PAGE 15 – **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Case No. 2:13-CV-1034 MJP

51.     On or about March 12, 2013, Madhavi Vuppalapati also issued the following guarantee checks to be issued on behalf of the following Defendants: (a) in the amount of $2,000,000 each for a total of $20,000,0000 from the bank account for Prithvi Information Solutions, LLC (b) ten checks in the amount of $2,000,000 each for a total of $20,000,0000 on behalf of PISL, (c) ten checks in the amount of $2,000,000 each for a total of $20,000,000 on behalf of Inalytix, (d) ten checks in the amount of $2,000,000 each for a total of $20,000,000 on behalf of Catalytic, and (e)  ten checks in the amount of $2,000,000 each for a total of $20,000,000 on behalf of PSI.  (Exhs. 69, 70, 71, 74.)  For each entity, Madhavi Vuppalapati likewise authorized in writing on behalf of the entity that Kyko could present the checks for payment at any bank for the outstanding amounts owed, at Kyko's sole discretion, upon giving 10 days' written notice to Madhavi Vuppalapati by email.  Said guarantee checks, or copies of the same, were sent by Madhavi Vuppalapati to Kyko by mail (including Fed-Ex) and wire, including by email transmission.

52.     PISI, IBS, Catalytic, and Inalytix also offered certain replacement customer accounts receivable (the "Replacement Customers") from roughly forty customers in the United States.  (Exhs. 78-79.)  Madhavi Vuppalapati and Mr. Pandyar certified by signed certificates under oath, individually and on behalf of each of one or more of these entities, on or about March 29, 2013, that the accounts receivable were owed for actual services rendered and that there was no dispute with the customer.   Madhavi Vuppalapati and Mr. Pandyar again certified with affidavits signed under oath, individually and on behalf of Inalytix, that an estimated $14 million owed on nine of the Replacement Customers accounts receivable were invoices for actual services rendered and that there was no dispute with the customers.  Such information was false and provided to perpetuate the scheme and induce Kyko to provide more money.  Said offerings and certificates were provided by the identified Defendants to Kyko by mail (including Fed-Ex) and wire, including by email transmission.  Just like the original Fake Five Customers, Kyko would later discover that some of the Replacement Customers were fake customers formed

PAGE 16 – **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Case No. 2:13-CV-1034 MJP

1    and controlled by one or more of the Defendants and were simply posing as legitimate customers

2    in an effort to further deceive and defraud Kyko and their good faith efforts to collect the more

3    than $17,000,000 then owed to them by Defendants.

4        53.    To further deceive Kyko and in an attempt to once again conceal Defendants'

5    fraudulent scheme, Defendants provided Kyko with seventeen additional account receivable

6    direct payment authorizations, similar to those the Defendants provided to Kyko for the original

7    Fake Five Customers.  (Exh. 73.)  Just as the acknowledgements for the Fake Five Customers

8    were fraudulent, the acknowledgments for the Replacement Customers were fraudulent as well

9    because they came from entities formed and controlled by Defendants posing as real customers

10   that were anything but a legitimate customer.  All of the material information on these

11   documents was fraudulent—names, witnesses, signatures, etc.  Said additional

12   acknowledgements were provided by Defendants to Plaintiffs by wire, including by email.

13       54.    On May 22, 2013, Kyko gave notice that it would present the guarantee checks

14   for the total amounts outstanding.

15       55.    On May 23, 2013, in an email to Kyko, PISL claimed that one of the Replacement

16   Customers, Process Map, Inc., had a large amount payable and that the contract had been

17   transferred to PISI and those receivables could be paid to Kyko.  (Exh. 99.)  Upon Kyko's

18   contact with Process Map, Inc. by email, Process Map, Inc. informed Kyko that it did not owe

19   "Prithvi" anything and that their "last engagement" with the company "was in 2003."  (Exh.

20   100.)  Even then, Satish Vuppalapati continued to attempt to perpetuate the fraud by arguing, via

21   email, that there was some mistake.  (Exh. 101.)

22       56.    On or about June 6, 2013, Kyko learned the guarantee checks were not negotiable

23   due to insufficient funds in the account(s) upon which they were drawn.

24

25

26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**G.**   **Kyko Begins to Discover Customer Account Receivables Were Fictitious, Counterfeit Entities Set-Up And Controlled By Defendants In Order To Deceive Kyko Into Advancing Monies.**

57.     While attempting in good faith to collect on the amounts owed in March 2013, Kyko simultaneously instigated its own investigation to determine whether the customer accounts receivable for the Fake Five Customers were legitimate invoices for ongoing services provided by PISL and its affiliates.  Kyko discovered that each of the Fake Five Customers receivables very likely did not exist and that each customer account receivable was intentionally created by Defendants for the express purposes of deceiving Kyko into advancing additional monies as follows (Exh. 127):

> a.   Dick's payments to Kyko had historically come from a bank account for "DCGS, Inc." The address for DCGS, Inc. was the same as the Washington address listed on Madhavi Vuppalapati's personal checks provided as guarantee checks in March 2013.  (Exh. 40-42.)

> b.   EPP payments to Kyko had previously been sent from "EPP, Inc."  A search of corporate records in March 2013 revealed that that the entity EPP, Inc. was a Washington corporation formed by Ms. Vuppalapati in July 2012.  (Exh. 48.)

> c.   Financial Oxygen payments to Kyko had previously been sent from a company called "Financial Oxygen, Inc."  A search of corporate records in March 2013 revealed that Mr. Sista was the President of the company and the company was formed in May 2012 with a principal place of business in Redmond, Washington.  (Exh. 37.)

> d.   Huawei payments to Kyko had previously been sent from a company called "Huawei Latin American Solutions, Inc."  A search of corporate records in March 2013 revealed that Mr. Sista was the President of that company and the company was formed in January 2012 in the State of Florida.    Kyko

PAGE 18 – **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Case No. 2:13-CV-1034 MJP

1    discovered that the address of the bank account for "Huawei Latin American

2    Solutions, Inc." was the same as the address submitted for Mr. Sista to Kyko

3    in March 2013 in Bellevue, Washington.  (Exh. 15.)

4    e.   L3C payments to Kyko had previously been sent from a bank account for a

5    company called "L3C, Inc."  A search of corporate records in March 2013

6    revealed that the company "L3C, Inc." was formed by Mr. Pandyar in July

7    2012.  (Exh. 50.)

8    58.    On or about March 8, 2013, Kyko's counsel contacted the legal department for

9 Dick's to verify the outstanding amount owed on the invoices to Kyko.  As previously referenced

10 in Paragraph 47 above, Kyko received a response on March 29, 2013 that exposed the fraud.

11 (Exh. 72.)  Counsel for Dick's responded that the PISL had done no work for the company since

12 2004 and that the persons who had executed the acknowledgment of the PISL invoices and the

13 person who had been PISL's contact for verification of the invoices did not exist.

14    59.    On or about March 8, 2013, Kyko's counsel contacted the legal department for

15 L3C to verify the outstanding amount on the invoices owed to Kyko.  L3C likewise advised

16 Kyko that the corporation did not employ the person identified as PISL's contact for invoice

17 verification purposes and that the company's records showed no amounts were owed for services

18 to PISL.

19    60.    On or about March 19, 2013, Kyko's counsel contacted the legal department of

20 EPP.  EPP's counsel advised that the company's records showed no amounts were owed on the

21 invoices identified by Kyko.

22    61.    For each of the Fake Five Customers and for various Replacement Customers, the

23 Vuppalapatis, and Mr. Pandyar at the direction of the Vuppalapatis, created fraudulent company

24 websites. These addresses for these websites were provided to Kyko by Defendants.  Much of

25 the information was duplicated from the authentic company's websites.  However, upon further

26 investigation in March 2013, Kyko discovered that the domain names for the Fake Five

PAGE 19 – **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Case No. 2:13-CV-1034 MJP

1   Customers' website were registered in 2011 or 2012 and that the Internet Protocol Addresses, a

2   unique four-part number identifying the precise location of the server, were the same four server

3   locations for almost all of the Five Customers and some of the forty Replacement Customers.

4   (Exhs. 126-127.)  These sham websites not only provided legitimate business information as a

5   façade for the sham customer account receivables, but they also facilitated the creation of sham

6   email addresses and names of contacts at these sham customers for purposes of corresponding

7   with Kyko.  For example, Kyko would write to an individual contact at Huawei, who did not

8   actually exist or work at the customer company, requesting conformation of the PISL invoices

9   and the individual contact would respond back to verify the invoices using the same email

10  specified on the sham websites. Defendants created, operated, and corresponded with Kyko

11  through these sham websites and email addresses to facilitate a fraud, deceive, and otherwise

12  misrepresent the existence of legitimate customer account receivables.

13  **H.   Sistas' Bankruptcy.**

14  62.   As noted above, the trial of this action was scheduled for July 7, 2014.  On June

15  17, 2014, the Pandyars and the Sistas filed respective petitions for bankruptcy. (Exs. 133-134.)

16  On June 19, 2014, the District Court entered the Order Staying Case with respect to the trial of

17  this action, "pending resolution of the bankruptcy proceedings."  (Dkt, #226).  The Sista

18  bankruptcy and the initial litigation were later consolidated, for all purposes on February 9, 2015.

19  (Dkt. #257).

20  63.   At his Rule 2004 Examination in connection with his bankruptcy, Mr. Sista pled

21  the Fifth Amendment against self-incrimination with respect to all questions related to Ananya,

22  the sham Financial Oxygen, Inc. and the sham Huawei Latin American Solutions Inc. (including

23  those related to the ownership of these companies), notwithstanding the fact that on his

24  Voluntary Petition, he disclosed that these three companies were insiders, in that he was a

25  director and/or officer thereof.  He refused to answer any questions relating to the business of

26  these companies, his role, their investments, their bank accounts, the filing of tax returns, and the

PAGE 20 – **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Case No. 2:13-CV-1034 MJP

1   existence of financial statements.  He further refused to answer any questions related to his

2   signature appearing on behalf of Ananya and PCI on the guarantees and general security

3   agreements executed in favor of Kyko.

4   64.   No records were preserved relating to these companies and their financial

5   condition, and their ability to honor guarantees and other obligations they made to Kyko.

6   **I.    Summary of Activity.**

7   65.   The Court finds that the Vuppalapatis are each directly responsible for

8   orchestrating the entirety of the scheme to defraud Kyko.  Every action in furtherance of the

9   scheme—false names, false companies, false customers, false accounts receivable, false

10  invoices, false wire transactions totaling millions of dollars—is attributable to the actions of and

11  direction from the Vuppalapatis.  Every action by Mr. Sista or Mr. Pandyar in furtherance of the

12  conspiracy to defraud Kyko was also at the direction of the Vuppalapatis.  The Vuppalapatis

13  have demonstrated that they will sign or swear under penalty of perjury to confessions or

14  guarantees with no concern for the underlying truthfulness.  (Exhs. 11, 12, 22, 24, 71, 75, 76, 86,

15  93-94.)  When confronted with evidence of their fraud, the Vuppalapatis have responded by

16  attempting to perpetuate additional fraud.  (Exhs. 73, 77-79, 99-101, 108.)

17  66.   The Court finds that, while Srinivas Sista acted largely at the direction of the

18  Vuppalapatis, in particular Madhavi Vuppalapati, Mr. Sista also played an active and knowing

19  role in perpetuating the fraudulent scheme by establishing various fraudulent companies and

20  bank accounts for those fraudulent companies.  (Exhs. 15, 31, 37, 80.)  That Mr. Sista knew his

21  actions were wrong and fraudulent is demonstrated by the adverse inferences created by his

22  deposition testimony.  Moreover, there is evidence in the record of Mr. Sista's family in India

23  receiving monetary payments  (Exh. 29.)

24  67.   The Court finds that representatives of PISL executed the following documents as

25  part of the conspiracy to defraud Kyko:  the Factoring Agreement (Exh. 2); the General Security

26  Agreement (Exh. 21); Guarantees (Exhs. 5, 7, 23); checks (Exhs. 8, 70); and the Confession of

Judgment (Exh. 105-A).  In additional, PISL was the entity for the bank account that received all of the money from Kyko by wire transmission.  (Exh. 138.)

68.     The Court finds that representatives of PSI executed the following documents as part of the conspiracy to defraud Kyko: the General Security Agreement (Exh. 81); Guarantees (Exhs. 76, 86); checks (Exh. 69); and the Confession of Judgment (Exh. 105-C).

69.     The Court finds that representatives of PISI executed the following documents as part of the conspiracy to defraud Kyko: the General Security Agreement (Exh. 82); Guarantees (Exhs. 76, 86); and the Confession of Judgment (Exh. 105-D).

70.      The Court finds that representatives of Inalytix executed the following documents as part of the conspiracy to defraud Kyko: the General Security Agreement (Exh. 85); Guarantees (Exhs. 76, 86); checks (Exh. 74); and the Confession of Judgment (Exh. 105-H).

71.     The Court finds that representatives of IBS executed the following documents as part of the conspiracy to defraud Kyko: the General Security Agreement (Exh. 83); and Guarantees (Exhs. 86, 91).

72.     The Court finds that representatives of Avani executed the following documents as part of the conspiracy to defraud Kyko: the General Security Agreement (Exh. 84); Guarantees (Exhs. 76, 86); and the Confession of Judgment (Exh. 105-M).

73.     The Court finds that representatives of Ananya executed the following documents as part of the conspiracy to defraud Kyko: the General Security Agreement (Exh. 80); Guarantees (Exhs. 76, 86); and the Confession of Judgment (Exh. 105-N).

**J.     Summary of Amount Owed.**

74.     The present amount owed by Defendants to Kyko is $33,579,660.  This amount is calculated as demonstrated in Exhibit B to the Declaration of Kiran Kulkarni ¶ 4.  The debt started at $3,012,090 on December 10, 2011 and progressively grew to $16,794,314 on February 23, 2013, which was around the time that the Fake Five Customers stopped paying money back to Kyko from their respective accounts.  At that time, interest is calculated weekly at 2.45% per

1    month as specified in the Final Settlement Agreement dated June 30, 2013.  (Exh. 103.)

2    Combining this interest rate (lower than the 5% allowed under the factoring agreements) with all

3    appropriate credits (i.e., payments, transferred stock value, etc.) arrives at the total of

4    $33,579,660 as of May 28, 2016.

5        75.    Exhibit A to the Declaration of Kiran Kulkarni ¶ 3 also calculates the amount of

6    the debt at the higher interest rate of 5%, resulting in the total of $36,826,838.  However, Kyko is

7    only seeking the lower total of $33,579,660.

8        **K.    Summary of Purpose**

9        76.    The Court finds that the interests of justice and fundamental fairness are served

10   through the entry of the judgment as outlined herein.  Kyko may utilize this judgment in pursuit

11   of justice and collection efforts in the United States as well as abroad under applicable

12   international law.

13                    **II.    CONCLUSIONS OF LAW**

14       77.    For Plaintiffs' fraud claims, each element of fraud must be established by clear,

15   cogent and convincing evidence.  *Stiley v. Block*, 130 Wash.2d 486, 505 (1996) (en banc).

16   Plaintiffs must prove the predicate acts for their civil RICO claim by a preponderance of the

17   evidence.  *Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 531 (9th Cir. 1987).

18   For Plaintiffs' negligent misrepresentation claim, Plaintiffs must prove by clear, cogent, and

19   convincing evidence that he or she justifiably relied on the information that the defendant

20   negligently supplied.  *Lawyers Title Ins. Corp. v. Baik*, 147 Wash.2d 536, 545 (2002) (en banc).

21   The creditor bears the burden of proving nondischargeability by a preponderance of the

22   evidence.  *In re Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010); *In re Candland*, 90 F.3d 1466,

23   1469 (9th Cir. 1996).  Plaintiffs must prove the remainder of their claims by a preponderance of

24   the evidence.

25       78.    The foregoing facts demonstrate that Kyko is entitled to judgment on the claims

26   set forth in its Complaint as discussed below.

1

2

### FIRST CAUSE OF ACTION

### (Fraud)

3      79.     To establish fraud, a plaintiff must demonstrate (1) representation of an existing

4    fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the

5    speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7)

6    plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9)

7    damages suffered by the plaintiff. *Stiley v. Block*, 130 Wash.2d 486, 505 (1996)(en banc).

8      80.     As set forth in the Findings of Fact, Defendants made representations regarding

9    the existence of accounts receivable and provided guarantees of indebtedness to induce Kyko to

10   enter into a factoring agreement with PISL.  These representations were material and induced

11   Kyko to enter into the factoring agreement.  These representations were false because the

12   accounts receivable were fictitious and Defendants never had any intention of honoring the

13   guarantees.  Defendants knew of their false and deceptive representations and intended for Kyko

14   to rely upon same.   Kyko was unaware of Defendants' false and deceptive representations and,

15   in fact, undertook due diligence activities to try to verify the validity of Defendants'

16   representations without success.  Kyko relied upon Defendants' representations and were entitled

17   to do same when deciding to enter in the factoring agreement.  Kyko has suffered damages due

18   to Defendants' misrepresentations, in an amount to be proven at trial, but not less than

19   $33,579,660, which amount includes all accrued pre-judgment interest, at the rate of 2.45% per

20   month calculated weekly, as set forth in the Declaration of Kiran Kulkarni ¶ 4, Exh. B.

21      81.     As a result of Defendants' fraudulent conduct, the Court awards Kyko a

22   $33,579,660 money judgment in their favor and against Defendants jointly and severally.

23

### SECOND CAUSE OF ACTION

24

### (Negligent Misrepresentation)

25      82.     To establish a negligent misrepresentation claim, a plaintiff must demonstrate: (1)

26   the defendant supplied information for the guidance of others in their business transactions that

was false; (2) that defendant knew or should have known that the information was supplied to guide the plaintiff in business transactions; (3) that the defendant was negligent in obtaining or communicating false information; (4) that the plaintiff relied on the false information supplied by the defendant; and (5) that the plaintiff's reliance on the false information supplied by the defendant was justified; and (6) that the false information was the proximate cause of damages to the plaintiff. *Lawyers Title Ins. Co. v. Baik*, 147 Wash.2d 536, 545 (2002)(en banc).

83.     As set forth in the Findings of Fact, Defendants supplied Kyko with information regarding accounts receivable and provided guarantees of indebtedness to induce Kyko to enter into a factoring agreement with PISL.  Defendants supplied false information pertaining to accounts receivable and the guarantees. Defendants knew or should have known that the information pertaining to the accounts receivable and guarantees would guide Kyko regarding their decision to enter into the factoring agreement. Defendants were, at a minimum, negligent when they communicated the false information to Kyko.  Kyko justifiably relied upon the false information when they decided to enter into the factoring agreement and, in fact, undertook due diligence activities to try to verify the validity of Defendants' representations without success. Kyko has suffered damages due to Defendants misrepresentations, in an amount to be proven at trial, but not less than $33,579,660, which amount includes all accrued pre-judgment interest, at the rate of 2.45% per month, calculated weekly, as set forth in the Declaration of Kiran Kulkarni ¶ 4, Exh. B.

84.     As a result of Defendants' negligent misrepresentation, the Court awards Kyko a $33,579,660 money judgment in their favor and against Defendants jointly and severally.

## THIRD CAUSE OF ACTION

### (Conversion)

85.     "Conversion is the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it. Money may become the subject of conversion, but only if the party charged with conversion wrongfully

1  received the money, or if that party had an obligation to return the money to the party claiming

2  it." *Brown v. Brown*, 157 Wash.App 803, 818 (2010).

3      86.    As set forth in the findings of fact, Defendants made false and misleading

4  statements regarding accounts receivables, the enforceability of Defendants' contracts with their

5  customers, and that payments on the accounts receivable would be made directly to Kyko.  These

6  false and misleading representations were made to induce Kyko to enter into the factoring

7  agreement wherein Kyko loaned money to PISL.  Accordingly, PISL wrongfully received the

8  loaned funds which amounts to conversion of same.  Kyko has suffered damages due to

9  Defendants' conversion, in an amount to be proven at trial, but not less than $33,579,660,

10  which amount includes all accrued pre-judgment interest, at the rate of 2.45% per month,

11  calculated weekly, as set forth in the Kulkarni Declaration ¶ 4, Exh. B.

12      87.    As a result of Defendants' conversion, the Court awards Kyko a $33,579,660.

13  money judgment in their favor and against Defendants jointly and severally.

14                    **FOURTH CAUSE OF ACTION**

15                **(Civil RICO - Wire and Mail Fraud)**

16      88.    The Racketeering Influenced Corrupt Organizations Act ("RICO") is codified at

17  18 USC § 1961 et seq.

18      89.    18 USC § 1962(c) states "It shall be unlawful for any person employed by or

19  associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

20  commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

21  affairs through a pattern of racketeering activity or collection of unlawful debt."

22      90.    Section 1962(d) states "[i]t shall be unlawful for any person to conspire to violate

23  any of the provisions of subsection (a), (b), or (c) of this section."

24      91.    To state a claim under Section 1962(c), a plaintiff must demonstrate (1) conduct

25  (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sanford v. Memberworks*

26  *Inc.*, 625 F.3d 550, 557-558 (9th Cir. 2010).

PAGE 26 – **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Case No. 2:13-CV-1034 MJP

92.     Section 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  An enterprise may be an association-in-fact. "[A]n associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise."  *Odom v. Microsoft,* 486 F.3d 541, 551(9th Cir.2007) (en banc). To establish an association-in-fact, the Plaintiff must show "a group of persons associated together for a common purpose of engaging in a course of conduct[ ] ... [and] must provide both evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." *Id.* at 552 (internal citation omitted).

93.     As set forth in the Findings of Fact, the Vuppalapatis were the masterminds behind the Defendants' scheme to defraud Kyko out millions of dollars. At the Vuppalapatis' direction, Defendants, including Guru Pandyar, signed documents, incorporated sham companies, set up fake bank accounts, and created fake email accounts to appear that they were PISL's customers.  Accordingly, the Defendants were part of an "enterprise" pursuant to Section 1961(4).

94.     Section 1961(5) defines "pattern of racketeering activity" as "at least two acts of racketeering activity ..."   " '[R]acketeering activity' is any act indictable under several provisions of Title 18 of the United States Code, and includes the predicate acts of mail fraud, wire fraud and obstruction of justice." *Turner v. Cook,* 362 F.3d 1219, 1229 (9th Cir.2004). Wire or mail fraud consists of the following elements: (1) formation of a scheme or artifice to defraud; (2) use of the United States mails or wires, or causing such a use, in furtherance of the scheme; and (3) specific intent to deceive or defraud.  *Sanford v. Memberworks Inc.*, 625 F.3d 550, 557-558 (9th Cir. 2010).

95.     As set forth in the findings of fact, Defendants devised an intentional scheme to defraud Kyko out of millions of dollars.  To carry out their scheme, Defendants utilized the U.S. mail system and wires, including email, on at least two occasions when communicating with

1    Kyko to effectuate their scheme.    Accordingly, Defendants engaged in a pattern of racketeering

2    activity.  Moreover, "[p]roof of an agreement which is a substantive violation of RICO (such as

3    conducting the affairs of an enterprise through a pattern of racketeering) is sufficient to establish

4    a violation of section 1962(d)."  *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993).

5          96.    Defendants have violated Section 1962(c) and (d).  18 U.S.C § 1964(c)  states

6    "[a]ny person injured in his business or property by reason of a violation of section 1962 of this

7    chapter may sue therefor in any appropriate United States district court and shall recover

8    threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee

9    ..."

10         97.    As a result of Defendants' racketeering activities, the Court finds that Kyko has

11   been damaged, in an amount to be proven at trial, but not less than $33,579,660, which amount

12   includes all accrued pre-judgment interest, at the rate of 2.45% per month, as set forth in the

13   Declaration of Kiran Kulkarni ¶ 4, Exh. B.  Pursuant to Section 1964(c), the Court awards a

14   money judgment in Kyko's favor and against Defendants for treble damages in the amount of

15   $100,738,980.00, plus the recovery of Kyko's reasonable attorney fees and costs.

16                              **SIXTH CAUSE OF ACTION**[2]

17                      **(Non-Dischargeability 11 USC 523(a)(2)(A))**

18         98.    11 USC § 523(a)(2)(A) states " [a] discharge under section

19   727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from

20   any debt--

21                 for money, property, services, or an extension, renewal, or refinancing of credit,

22                 to the extent obtained by--

23

24

25   [2] The Fifth Cause of Action, for Civil RICO under the Financial Institution Fraud prong, was
     withdrawn by Kyko.  The Fourth Case of Action, for Civil RICO under Wire and Mail Fraud
26   prong, remains and was argued.

     PAGE 28 – **FINDINGS OF FACT AND CONCLUSIONS
     OF LAW**

     Case No. 2:13-CV-1034 MJP

false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

99.     In order to establish a claim under Section 523(a)(2)(A), a plaintiff must establish (1) the debtor made ... representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained damages as the proximate result of the misrepresentations. *In re Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010)

100.     As set forth in the findings of fact, Satish Vuppalapati signed guarantees for PISL, and Mr. Pandyar for PCI**,** with full knowledge that they had no intent of honoring them.  These guarantees were given to Kyko to in order to obtain funds under the factoring agreement and Kyko relied upon the guarantees when they decided to issue the funds.  Sistas' actions in establishing fraudulent companies and bank accounts for those fraudulent companies caused Kyko to sustain damages in the form of lost funds.

101.     Pursuant to 11 USC § 523(a)(2)(A), the Court awards a non-dischargeable money judgment in favor of Plaintiff and against Sista, and his marital community, in the amount of $100,738,980.00.

## SEVENTH CAUSE OF ACTION

### (Non-Dischargeability 11 USC 523(a)(2)(B))

102.     11 USC § 523(a)(2)(B) states " [a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-- for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--use of a statement in writing--

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

PAGE 29 – **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Case No. 2:13-CV-1034 MJP

1    (iv) that the debtor caused to be made or published with intent to deceive."

2    103.    To establish a clam under Section 523(a)(2)(B), a plaintiff must establish: (1) a representation of fact by the debtor, (2) that was material, (3) that the debtor knew at the time to be false, (4) that the debtor made with the intention of deceiving the creditor, (5) upon which the creditor relied, (6) that the creditor's reliance was reasonable, (7) that damage proximately resulted from the representation. *Candland v. Ins. Co. of North America*, 90 F.3d 1466, 1469 (9th Cir. 1996).

104.    As set forth in the findings of fact, Srinivas Sista made numerous representations of material fact that he knew to be false, through a variety of sham companies, all with the intention that Kyko should rely on the same.  Kyko did reasonably rely on the same, directly resulting in substantial monetary damages to Kyko.   Mr. Sista also perpetuated the fraud by knowingly signing guarantees that he knew would not be honored, setting up sham companies to trick Kyko into believing it had adequate security to cover the funds it issued to PISL, and setting up bank accounts for the sham companies which served as vehicles through which Defendants converted Kyko's funds. Accordingly, the Court finds that Kyko has satisfied the requirements of 523(a)(2)(B), and awards a non-dischargeable money judgment in favor of Kyko and against Sista, in the amount of $100,738,980.00, including a judgment against the marital community of Srinivas Sista and Lalita Sista.

### EIGHTH CAUSE OF ACTION

### (Objection/Denial of Discharge 11 USC 727(a)(3))

105.    11 U.S.C. § 727(a)(3) states " The court shall grant the debtor a discharge, unless ... the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."

106.    In order to establish a prima facie case under Section 727(a)(3), a creditor must show: (1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions. *In re Caneva*, 550 F.3d 755, 761 (9th Cir. 2008).

107.    As set forth in the findings of fact, and as detailed in the Sista Rule 2004 Examination, and the willful non-responsiveness to Kyko's legitimate inquiries for records and information regarding the massive fraud to which Srinivas Sista participated, at a deep level, the Court finds that Kyko has satisfied the requirements of 727(a)(3), and awards a non-dischargeable money judgment in favor of Kyko and against Sista, in the amount of $100,738,980.00, including a judgment against the marital community of Srinivas Sista and Lalita Sista.

///

## NINTH CAUSE OF ACTION

### (Non-Dischargeability 11 USC 523(a)(4))

108.    11 U.S.C. § 523(a)(4) states "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt -- for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

109.    As set forth in the findings of fact, Satish Vuppalapati executed guarantees of PISL, and Mr. Pandyar for PCI, and the other cross guarantors to induce Kyko to issue funds under the factoring agreement, with the assistance of Mr. Sista.  Upon receipt of these guarantees, which Srinivas Sista knew would not be honored, Kyko then advanced the funds which were fraudulently converted.  Accordingly, Srinivas Sista willfully injured Kyko under Section 523(a)(4).

110.    Based on the preceding, the Court awards a non-dischargeable money judgment in favor of Kyko and against Sista, in the amount of $100,738,980.00 including a judgment against the marital community of Srinivas Sista and Lalita Sista.

## TENTH CAUSE OF ACTION

### (Non-Dischargeability 11 USC 523(a)(6))

111.    11 U.S.C. § 523(a)(6) states " [a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt- - for willful and malicious injury by the debtor to another entity or to the property of another entity."

112.    "Conversion is an injury under section 523(a)(6)."  *In Re Eppard*, 502 B.R. 458, 463 (Bankr. W.D. Va. 2012) *citing Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332 (1934). "A plaintiff alleging conversion must have a property interest in the converted property and be entitled to immediate possession of the same."  *Id*.  As set forth in the Third Cause of Action, Srinivas Sista is liable for conversion of the funds issued under the factoring agreement. Accordingly, Plaintiffs have suffered an "injury" under section 523(a)(6).

113.    Under Section 523(a)(6), the malicious injury requirement is separate from the willful injury requirement.  *In re Barboza*, 545 F.3d 702, 706 (9th Cir. 2008).  A "willful" injury is an intentional *injury,* not merely an intentional *act* that leads to injury.  *Id.* at 706 (emphasis included)(internal citations omitted).  "A malicious injury involves  (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Id.* at 706 (internal citations omitted)

114.    As set forth in the findings of fact, Mr. Vuppalapati executed guarantees of PISL, and Mr. Pandyar on behalf PCI and the other cross guarantors to induce Kyko to issue funds under the factoring agreement, with the assistance of Mr. Sista.  Upon receipt of these guarantees, which Srinivas Sista knew would not be honored, Kyko then advanced the funds

which Defendants converted.  Accordingly, Srinivas Sista willfully injured Kyko under Section 523(a)(6).

115.    As set forth in the findings of fact, Srinivas Sista committed a wrongful act by knowingly signing guarantees that he knew would not be honored, setting up sham companies to trick Kyko into believing it had adequate security to cover the funds it issued to PISL, and setting up bank accounts for the sham companies which served as vehicles through which Defendants converted Kyko's funds.  These acts were done intentionally which injured Kyko by conversion of Kyko's funds. Defendants actions were done without just cause or excuse.  Accordingly, Srinivas Sista maliciously injured Kyko under Section 523(a)(6).

116.    Pursuant to 11 USC § 523(a)(2)(6), the Court awards a non-dischargeable money judgment in favor of Plaintiff and against Sista, in the amount of $100,738,980.00, including a judgment against the marital community of Srinivas Sista and Lalita Sista.

## ELEVENTH CAUSE OF ACTION

### (Attorney Fees and Costs)

117.    Prior to the December 1, 2014, amendment of Rule 7008 which eliminated subpart (b), the Rule stated "[a] request for an award of attorney's fees shall be pleaded as a claim in a complaint, cross-claim, third-party complaint, answer, or reply as may be appropriate." *In re Hunt*, 238 F.3d 1098, 1101 (9th Cir. 2001).  Because Kyko filed their Complaint prior to December 1, 2014, this Court will apply Rule 7008(b).  Accordingly, this Court finds that Kyko has properly pled their request for attorney fees and awards Kyko the recovery of their reasonable attorney fees and costs pursuant to 18 U.S.C § 1964(c).

/

/

/

1      Based on the above, the Court directs that judgment be entered for Plaintiffs and against

2  Defendants consistent with the findings and conclusions made herein.

3

4      Dated this 13th day of June, 2016.

5

6

7                                                    Marsha J. Pechman
                                                     United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PAGE 34 – **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Case No. 2:13-CV-1034 MJP